Paul WALTER and Jean Walter, Plaintiffs-Appellants,

v.

CESSNA AIRCRAFT COMPANY, a foreign corporation, Defendant-Respondent.†

Court of Appeals

*No. 83–2069. Submitted on briefs September 4, 1984.—Decided October 24, 1984.*
(Also reported in 358 N.W.2d 816.)

† Petition to review denied.

For the plaintiffs-appellants, the cause was submitted on the briefs of *William P. Croke* and *Larry J. Britton*, of *Prosser, Wiedabach & Quale, S.C.*, of Milwaukee.

For the defendant-respondent, the cause was submitted on the brief of *James P. O'Neill* and *Bruce A. Marshall*, of *Arnold, Murray, O'Neill & Schimmel, S.C.*, of Milwaukee.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.   The issue is whether the trial court erred when it found, as a matter of law, that the facts did not warrant submission of a punitive damage ques-

tion to the jury. We hold that the trial court did err and reverse.

On May 5, 1979, Paul Walter purchased a 1954 Cessna 195B airplane in Tampa, Florida. Walter, an experienced pilot, had been looking for this specific type of aircraft for some period of time because it was a five-passenger aircraft that, if properly maintained, was a rugged, safe airplane and could be purchased for far less than the cost of a new five-passenger plane. Prior to the sale, he flew the airplane several times and had a mechanic verify its airworthiness.

After the sale, Walter took his wife and children to Disney World in Orlando, Florida for several days. During this time, the plane was stored outdoors at an airport in Clearwater-St. Petersburg, Florida. While the Walters were away, a heavy rainstorm took place in the Tampa Bay area. Upon Walter's return, he and his family went to the airport. The plan was for Walter to fly the plane to the Tampa airport. His wife and children would drive a leased car to that airport and meet him. They would then fly home. In preparation for his flight, Walter had studied the owner's manual. He then took off from the airport, and moments later, the airplane crashed. Although Walter was not seriously injured, the plane was a total loss, and Walter sued Cessna.

His suit alleged, *inter alia*, that there was water in the fuel system, that this condition caused the plane's engine to fail, and that the plane was manufactured without fuel tank sump pump quick drains sufficient to allow pilots to alleviate fuel contamination. Walter then averred that Cessna was guilty of negligence because it had knowledge that failure to have quick drains added onto the plane would be dangerous; yet, nothing was done to warn of the plane's dangerous condition without the quick drains. (Although Walter alleged

strict liability in design defect as well as negligence, the jury found no strict liability, and this is not a subject on appeal.) Additionally, Walter asked for punitive damages because he claimed that Cessna knew of this dangerous condition and yet failed to warn its customers, thereby recklessly endangering their lives.

The case went to trial, and at the end of the case, Cessna requested that the jury not be instructed on punitive damages. The court agreed and that is the issue on appeal.

The issue is not whether punitive damages are recoverable in a product liability suit based on negligence or strict liability in tort. That issue was decided in the exhaustive and well-considered opinion of *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 294 N.W.2d 437 (1980). Nor is it necessary to determine what must be proven, over and above evidence of negligence or strict liability, in order for a punitive damages issue to be considered. *Wangen* decided that "[o]nly where there is proof of malice or willful, wanton, reckless disregard of plaintiff's rights can punitive damages be considered." *Id.* at 275, 294 N.W.2d at 446. In other words, there must be circumstances of aggravation in the tortious injury, *i.e.*, outrageous conduct. *Id.* at 268, 294 N.W.2d at 442–43.

What we must determine is what factors the trial court should consider in deciding whether there is credible evidence for punitive damages to be considered by the jury. In other words, what are the threshold elements of outrageous conduct? We must reach this issue because the *Wangen* court charged trial courts with the duty to initially determine whether the evidence in a particular case establishes a proper case for the allowance of punitive damages and for the submission of the issue to the jury. *Id.* at 298, 294 N.W.2d at 457. Because trial courts are given that duty, it is imperative that they,

and the bar as well, have guidelines for what kind of manufacturer conduct must be shown in order to meet the *Wangen* standard. Two law review articles, Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1258 (1976) [hereinafter cited as Owen] (cited in *Wangen*) and Ghiardi and Kircher, *Punitive Damage Recovery in Products Liability Cases*, 65 Marq. L. Rev. 1 (1981) [hereinafter cited as Ghiardi and Kircher] point to the need for determining what type of conduct raises a manufacturer's behavior to a level which we call "reckless disregard." Both present a list of elements that courts can look to for instruction when faced with making a finding whether evidence of malice or willful, wanton, reckless disregard exists so as to make punitive damages a jury question. We will explore the rationale of these two articles.

First, it is important to reiterate one of the most important teachings of *Wangen* and a case preceding it, *Kink v. Combs*, 28 Wis. 2d 65, 135 N.W.2d 789 (1965). An intentional desire to injure is not a necessary component of a punitive damages case. *Wangen*, 97 Wis. 2d at 267, 294 N.W.2d at 442. So, although a defendant may indeed be subject to punitive damages if the defendant has acted maliciously *or* willfully, it may also be subject to punitive damages if it acts in reckless disregard of the plaintiff's rights. *Id.* at 298–99, 294 N.W. 2d at 457.

This is not to say that the *Wangen* court has equated "reckless disregard" with truly inadvertent or negligent conduct. Instead, *Wangen* defined reckless disregard as "[r]eckless indifference to the rights of others and *conscious action in deliberate disregard of them* . . . ." *Id.* at 267, 294 N.W.2d at 442 (emphasis added), quoting Restatement (Second) of Torts § 908, comment b

(1977). A plaintiff must look to the frame of mind of the wrongdoer as a necessary prerequisite to recovery of punitive damages. *Id.* at 268, 294 N.W.2d at 442–43. Although intent to injure is not necessary, some type of aggravated conduct (knowledge, at the least) is a needed component. *Cf.* Ghiardi and Kircher at 57. As Professors Ghiardi and Kircher point out, a defendant who is unaware of the product's defect can hardly be "consciously" or "recklessly" disregarding any other party's rights. *Id.* at 68. They also point out that in every case where punitive damages have been awarded, the defendant manufacturer was aware of the existing defect and was also aware of the serious danger of substantial harm posed by such defect.[1] *Id.* at 68–69. We conclude that *Wangen,* as well as other punitive damage cases in the products liability area, demands that the defendant have specific knowledge of a product's defect and its potential for harm before an exemplary award is appropriate.[2]

Having reiterated the first element established by the *Wangen* court as necessary before punitive damages can be justified, we next turn to the second element. Professors Ghiardi and Kircher and Professor Owen de-

---

[1] A manufacturer's knowledge is to be determined objectively, not subjectively. Owen writes that the manufacturer's actual state of mind is first: "an ethereal concept that is difficult to prove. Second, it is quite unlikely that a manufacturer can ever be acting in good faith when it seriously endangers the public through grossly irresponsible conduct. Third, the manufacturer's subjective state of mind is largely irrelevant to the basic question of whether there is a social need to deter such misbehavior."

Owen at 1368 (footnotes omitted).

[2] Of course, if a manufacturer studiously avoids gaining any knowledge of the defect and the specific harm it may cause, it will not have knowledge in the literal sense. However, it would be liable anyway because of its fraudulent misconduct.

fine this second element as "fault on the part of the defendant." They state that once the defendant possesses knowledge of the nature of the defect and has determined the seriousness of the danger, failure to take some action, which the product and services demand, may result in reckless disregard. *Id.* at 84; Owen at 1362–63. The failure may consist of inadequate testing procedures, defective quality control, insufficient warnings or inadequate remedial procedures, such as product recalls or post-marketing warnings. Ghiardi and Kircher at 84. This fault of the defendant can occur during either the pre-marketing or post-marketing stages.

All of these are what Professor Owen calls "marketing conduct." Professors Ghiardi and Kircher sum up this element by stating that it:

involves nothing more than proving the defendant acted negligently with respect to the care it exercised in distributing the product to the public. When combined with the defendant's knowledge, this fault or negligence may rise to the level of "conscious disregard of the safety of others" . . . .

Ghiardi and Kircher at 84.

These two elements must, however, reflect "a *flagrant* indifference to the public safety." Owen at 1369 (emphasis added). Our supreme court uses the word "outrageous" as an abbreviation of the term "flagrant indifference to the public safety." *See Wangen,* 97 Wis. 2d at 267–68, 294 N.W.2d at 442. To determine whether there has been outrageous or flagrant conduct, Professor Owen suggests consideration of five factors. They are:

(1) the existence and magnitude in the product of a danger to the public;

(2) the cost and feasibility of reducing the danger to an acceptable level;

(3) the manufacturer's awareness of the danger, of the magnitude of the danger, and of the availability of a feasible remedy;

(4) the nature and duration of, and the reasons for, the manufacturer's failure to act appropriately to discover or to reduce the danger; and

(5) the extent to which the manufacturer purposefully created the danger.

Owen at 1369. He describes each factor as follows:

First, a manufacturer's fault in failing to deal with a product hazard increases with the magnitude of the resulting potential for harm to the public. Second, as the costs of reducing such a hazard to an acceptable level diminish, so also does the credibility of excuses for failing to do so. Third, as the manufacturer's awareness of the existence, magnitude, and means to reduce a product hazard increases, so too does its duty to address the problem and its culpability for failing to do so. Fourth, the nature and duration of a manufacturer's failure to respond appropriately to a product hazard, its reasons for not responding more appropriately, and the nature and extent of any measures actually taken, all shed light on the extent to which the enterprise values profits over safety, and, accordingly, on its culpability. Finally, if the manufacturer created the danger deliberately, as by knowingly deceiving the public about the product's safety, it will usually be especially blameworthy and deserving of punishment.

Owen at 1369–70 (footnotes omitted). We hasten to point out that these factors are not prerequisites for finding whether the defendant's marketing conduct was outrageous such that each must be proven in every case. Nonetheless, they provide a useful guideline for trial courts in deciding whether to send the punitive damages issue to the jury. As the *Wangen* court made clear, each product liability case must be judged on its own merits—on a case-by-case basis. The factors cited here

can help determine whether the manufacturer's conduct exposed consumers to unreasonable risks of harm such that a jury may extract the profit realized from the sale of the defective product. While knowledge and fault are the prerequisites, the five factors can be used to determine whether the evidence is of such a level that a jury could find the conduct to be unreasonable.

In fact, although our supreme court has not explicitly accepted the Owen factors, it has done so in principle. In *Wussow v. Commercial Mechanisms, Inc.*, 97 Wis. 2d 136, 293 N.W.2d 897 (1980), the court decided whether a trial court had properly allowed a punitive damage question to go to the jury in a product liability suit. The product involved was a pitching machine used for batting practice by the local school district baseball teams. In discussing the evidence, the court considered: (1) the defendant's knowledge of the defect; (2) knowledge of prior accidents and injuries resulting from the defect; (3) the availability of a feasible remedy already used by competitors, and (4) the nature and duration of the manufacturer's failure to act. We conclude that the Owen factors are worth considering.

Having clarified the two elements that make a manufacturer a "wrongdoer" and having identified a guideline for trial courts to consider whether there is evidence from which a jury could find that the wrongdoer's conduct was "outrageous," we now return to the facts in this case.

In this case, the trial court correctly exercised its responsibility, as commanded in *Wangen*, to initially determine whether the evidence established a proper case for the allowance of punitive damages. The question is whether its determination was correct.

In reviewing this issue, we must initially specify the proper standard of review when a trial court finds that

a punitive damage question should not go to the jury. Cessna claims this was a discretionary action of the trial court. Cessna is wrong. The trial court's posture was to decide, as a matter of law, if there were sufficient credible facts to allow a jury to find Cessna's conduct to be outrageous. Because it is a question of law for the trial court, so it is with this court. We owe no deference to the trial court's holding. *See Behnke v. Behnke,* 103 Wis. 2d 449, 452, 309 N.W.2d 21, 22 (Ct. App. 1981).

A review of the evidence shows that the 1954 Cessna 195B is known as a taildragger because it has, as its third point of contact, a wheel at the back of the plane as opposed to at the nose. Because of this, the plane rests at an angle on the ground. The gas tanks for this plane are found in the wings. This is important because the fuel tank sits above the engine. Cessna admitted, in answers to interrogatories, its awareness that water could accumulate in the tanks of the plane if stored outdoors. One obvious way for contaminants to enter the fuel system is through the fuel tank openings.

When Cessna built this 1954 195B, it acted to prevent fuel contamination by incorporating fuel tank sump drain plugs. The purpose of the drain plug is to remove water and sediment from the bottom of each fuel tank. The plug is nothing more than a nut screwed into the sump. An accompanying Cessna owner's manual instructed pilots to use these during the 100-hour inspections under normal operating conditions.

Walter presented evidence which, if taken in a light most favorable to the plaintiff, indicates that the drain plug was inadequate and that, at least by 1961, the aircraft industry was aware of the increasing number of accidents attributed to fuel contamination. Only by use of what is called a "quick drain" could a pilot be assured that all water in the gas tanks is removed. The drain is a device allowing liquid to drain through an

opening upon insertion of a pin. Fuel can then be easily collected and studied to see if it contains water.

The record reveals that in 1961, the Federal Aviation Agency (FAA) sent a release expressing its alarm about accidents occurring because of fuel contamination. The FAA wrote:

It is suggested that aircraft owners be encouraged to have quick-drain valves installed in aircraft fuel tanks. Preliminary tests, as described below, made on the fuel system of a high-wing light aircraft revealed certain conditions which are potentially dangerous and are not believed to be generally known to pilots.

The report went on to explain that plugs were inadequate because it was necessary to drain ten liquid ounces of fuel before any water appeared. This was considerably more than most pilots drain when checking for water. Cessna did nothing to alert pilots of this problem until 1969.

In 1969, a service letter was sent to all Cessna dealers, all Cessna owners who had purchased a plane within the past year and all other owners who paid an annual subscription fee for the service letters. The letter was not sent to all owners, although the evidence shows that Cessna could easily have traced all owners of planes manufactured prior to 1969.

From 1970–1972, the National Transportation Safety Board (NTSB) performed a study on fuel starvation. The board found that 26% of all crashes involving Cessna aircraft were due to fuel contamination. The study concluded that pilots must be informed of the problem because they lacked knowledge. The study also urged that quick drains be used and that owner's manuals be more specific regarding use of the drains.

Cessna added quick drains in the 1975 models but failed to inform owners of pre–1975 aircraft that the drains were either available or necessary. In 1976, the

FAA again warned of inadequacies caused by failure to inform about quick drains. In September 1979, Cessna did inform all owners of the availability of quick drains. (Walter's crash was in May of that year.) Even in this 1979 release, however, the owners were not warned of the problem of fuel contamination or the proper method of checking for it. In 1980, the FAA cited nineteen Cessna airplane crashes due to fuel contamination and instructed Cessna to change its owner's manual instruction. Cessna then informed owners of all pre-1975 Cessnas that fuel contamination was a danger and suggested a procedure for checking fuel contamination but did not recommend installation and use of quick drains. This was in spite of the fact that several Cessna executives asked that installation of quick drains be strongly recommended.

Cessna's only explanation for not following the recommendations of either the FAA or NTSB is that it felt contacting owners of pre–1975 model aircraft was unnecessary.

Based on the above evidence, viewed in a light most favorable to the plaintiffs, the trial court should have submitted the punitive damages claim to the jury. Both the elements of knowledge and fault are present. Cessna had knowledge of crashes due to fuel contamination at least as far back as the 1971–1972 NTSB report. It had knowledge that even experienced pilots usually do not drain ten ounces of gas from their plane while checking for fuel contamination. It had knowledge that quick drains would be an easy means for pilots to check for fuel contamination. There is credible evidence that despite this knowledge, inadequate information and warnings were given to all owners of pre–1975 Cessna airplanes by means of additions to the owner's manuals.

As to whether there is credible evidence that Cessna's conduct was outrageous, application of the Owen factors reveals the following:

(1) The existence and magnitude in the product of a danger to the public.

The obvious answer here is that there exists credible evidence of air crashes posing a serious risk of death.

(2) The cost and feasibility of reducing the danger to an acceptable level.

There is credible evidence from which a jury could determine that dissemination of information supplemental to the owner's manual would be feasible. The jury could come to a conclusion that its costs would be minimal in comparison to the danger.

(3) The manufacturer's awareness of the danger, of the magnitude of the danger, and of the availability of a feasible remedy.

There is evidence that Cessna was aware of the danger at least as early as receipt of the 1971–1972 NTSB report and most likely before that time. There is also evidence of air crashes in Cessna airplanes due to fuel contamination. A jury could also infer that seasoned pilots would be uninformed that the normal amount of fuel drainage will not produce signs of water contamination and that an orchestrated information campaign by use of updating owner's manuals would be an available method of educating pilots.

(4) The nature and duration of, and the reasons for, the manufacturer's failure to act appropriately to discover or to reduce the danger.

Although quick drains have been marketable since at least the 1960's, no information urging deployment

of the drains was forthcoming to all pre-1975 Cessna owners until after Walter's crash. A jury could infer that Cessna either felt that pilots should know about drains without prompting by the manufacturer or that it just did not want to spend the money to enhance the pilots' safety. It should be the jury's determination whether these facts evidence reckless disregard.

Cessna responds that the quick drain is itself dangerous because people can bash their heads on the protruding drain; also, it increases air resistance. Whether this is a good reason not to inform pilots of the use of the drains is subject to dispute—an issue the jury should decide. It should be noted that these objections really pertain only to the earlier valves used about the time of the Korean war; they do not pertain to valves manufactured after 1960 and certainly not to valves put into Cessna planes in 1975 and thereafter.

Several other responses by Cessna miss the mark as well. For instance, Cessna complains that pilots are trained aviators and must know safety essentials. Therefore, informing them of quick drains should be unnecessary. This, however, is a jury question. It is for the jury to determine whether this is a valid defense. Suffice it to say that when the FAA raises alarm that pilots do *not* know the extent of the contamination drain problems or how to avoid them, Cessna's defense could well be discounted by a jury. Another claim by Cessna is that the FAA only made "suggestions" to the manufacturers about informing owners of this problem and did not send out an "airworthiness directive" (an order that *must* be followed by a manufacturer). This is used by Cessna as an attempt to buttress its conclusion that the problem was not serious. That, too, is a jury question. We conclude that Cessna's arguments are better made to the jury. The facts in this case require

that the trial court should have, as a matter of law, submitted this matter to them.[3]

One unrelated issue remains. Walter claims he is entitled to prejudgment interest on his claim for property damage because the value of the plane was capable of a reasonably certain standard of measurement. According to our present law, a party is entitled to prejudgment interest only if the amount claimed is a liquidated amount or if there is a reasonably certain standard of measurement available.

In this case, the jury awarded $13,000 as to the value of the plane. Walter had proposed $26,000. An expert testified that the value of a plane like Walter's could range anywhere from $12,500 to $63,000. This is hardly a certain standard of measurement. The trial court correctly denied prejudgment interest.

The case is remanded to the trial court with directions to try the punitive damage issue. *Badger Bearing, Inc. v. Drives & Bearings, Inc.,* 111 Wis. 2d 659, 673–74, 331 N.W.2d 847, 855 (Ct. App. 1983). Because this case is affirmed in part and reversed in part, no costs will be allowed to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

---

[3] There is no evidence in the record to indicate that the fifth factor, a purposeful creation of the danger by the manufacturer, applies.