James H. MULHERN and Nancy Mulhern,
Plaintiffs-Respondents,

v.

OUTBOARD MARINE CORPORATION, Defendant-
Third-Party Plaintiff-Appellant and Cross-
Respondent,†

Edward KROGGEL, Third-Party Defendant and
Cross-Appellant.

Court of Appeals

*No. 87–2320. Submitted on briefs August 9, 1988.—Decided
September 27, 1988.*

(Also reported in 432 N.W.2d 130.)

† Petition to review denied.

606

For the plaintiffs-respondents the cause was submitted on the briefs of *Shneidman, Myers, Dowling & Blumenfield* by *Robert G. Dowling* of Milwaukee.

For the defendant-third-party plaintiff-appellant the cause was submitted on the briefs of *Peterson, Johnson & Murray, S.C.* by *Donald R. Peterson* and *Craig A. Christenson* of Milwaukee.

For the third-party defendant-cross-appellant the cause was submitted on the briefs of *Brennan & Brennan* by *Joseph K. Brennan* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. Outboard Marine Corporation (OMC) appeals a judgment granting compensatory and punitive damages to James H. Mulhern (Mulhern) and Nancy Mulhern.[1] Edwin Kroggel (Kroggel) cross appeals the judgment dismissing OMC's third-party action against him and denying his postverdict motion for reasonable costs and attorney's fees under sec. 814.025, Stats.

In 1971 or 1972, Mulhern purchased a used 1957 thirty-five horsepower Johnson outboard motor from his brother-in-law, Kroggel. Kroggel was employed as a mechanic in OMC's Evinrude service department. In approximately 1973, Kroggel offered to service Mulhern's motor at the Evinrude service department. After inspecting the motor, Kroggel discovered that it was necessary to replace several parts. He used parts from different motors, with varying make and year,

---

[1]For the purposes of this decision, we will refer only to James Mulhern's claim.

which had been salvaged from motors brought into the department under warranty. Kroggel reinstalled a limited throttle start-in-gear mechanism that had been designed and manufactured by OMC, the same type of mechanism had been in the motor before he began to rebuild it. Before returning the motor to Mulhern, Kroggel gave the motor to the motor tester at OMC to determine if the motor was operating according to OMC's standards. The motor tester approved the work and the motor was returned to Mulhern with no charge for labor or parts.

Mulhern has no complaints about the motor until 1976. At that time, Mulhern inadvertently started the motor while it was in gear but he was not injured. Since he believed that the motor was designed to start in neutral only, he contacted Kroggel. Kroggel, who also believed that the motor could only start while in neutral, replaced a spring in the interlock mechanism and returned the motor to Mulhern. On August 6, 1977, while boating at his lake cottage, Mulhern accidently started the outboard motor in gear causing the boat to suddenly lunge forward, pulling him partially out of the boat. Mulhern's right leg was severely injured when it came in contact with the motor propeller. As a result of the accident, Mulhern's right leg was surgically amputated.

In his second amended complaint, Mulhern alleged that the limited throttle interlock system, incorporated in the motor, had been defectively designed because it allowed the motor to start while in gear and with varying amounts of power. Mulhern contended that OMC was liable for his injuries under the theories of strict liability and negligence.

OMC brought a third-party action against Kroggel alleging that he had been negligent in rebuilding

Mulhern's motor and that his actions were the cause of Mulhern's injuries. The jury found OMC liable for Mulhern's injuries under the theories of strict liability and negligence. The jury also found that Kroggel had not been negligent. The trial court granted judgment on the verdict and denied OMC's postverdict motion for a new trial. It also denied Kroggel's motion for reasonable costs and attorneys fees under the frivolous claims statute, sec. 814.025, Stats.

On appeal, OMC raises five issues: (1) Whether the doctrine of strict liability can be applied in a nonsale context; (2) whether the Federal Boat Safety Act preempts state tort law; (3) whether the trial court abused its discretion when it submitted instructions and verdict questions to the jury which were limited to the design and manufacture of the interlock device, rather than the motor as a whole; (4) whether the trial court abused its discretion when it admitted tests which had been performed after the motor had been reassembled; and (5) whether there is any credible evidence to uphold the jury award of punitive damages. Kroggel raises one issue in his cross appeal: Whether OMC's third-party claim against Kroggel was frivolous.

## STRICT LIABILITY IN NONSALE TRANSACTIONS

Kroggel rebuilt Mulhern's motor at OMC's Evinrude service department using salvaged parts, including a limited throttle start-in-gear interlock mechanism. However, OMC did not charge Mulhern for parts or labor on the motor. OMC alleges that it was unaware of the service performed on Mulhern's motor and did not approve of it. OMC argues that the

doctrine of strict liability is inapplicable because it requires an actual sales transaction. Since Mulhern did not purchase the motor or its parts from OMC, OMC contends that the trial court erred when it applied the doctrine to this case. We disagree.

The application of strict liability to the facts of this case is a question of law. This court decides questions of law independently and without deference to the trial court's decision. *Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

The Wisconsin Supreme Court, in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967), adopted the rule of strict liability in tort as set forth in the Restatement (Second) of Torts sec. 402A (1965).[2] To recover under strict liability, a plaintiff must prove:

> (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or

[2]Restatement (Second) of Torts sec. 402A states:

Sec. 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule states in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

*Dippel,* 37 Wis. 2d at 460, 155 N.W.2d at 63.

OMC alleges that because sec. 402A(1) of the Restatement states that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability," an actual sales transaction must occur before it can be held liable under the theory of strict liability.

Comment 1 of sec. 402A provides:

*User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller .... It is not even necessary that the consumer have purchased the product at all. ... The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.

The issue of whether a technical sale must occur before the doctrine of strict liability can apply has not been addressed before in Wisconsin. However, the doctrine has been applied in the nonsale context in other jurisdictions.

In *Delaney v. Towmotor Corp.,* 339 F.2d 4 (2d Cir. 1964), the manufacturer of a forklift truck gave a demonstrator to the plaintiff's employer. The plaintiff was subsequently injured by the vehicle. The Second

Circuit concluded that although no technical sale had occurred, the manufacturer was liable under the doctrine of strict liability because it was responsible for placing the defective product in the "stream of commerce." *Id.* at 6. *Accord First Nat'l Bank of Mobile v. Cessna Aircraft Co.,* 365 So. 2d 966, 968 (Ala. 1978). The terms "sell" and "seller" as stated in sec. 402A are merely descriptive and "the product need not be actually sold if it is injected into the 'stream of commerce' by other means." *Link v. Sun Oil Co.,* 312 N.E.2d 126, 130 (Ind. Ct. App. 1974); *Henderson v. Gould, Inc.,* 341 S.E.2d 806, 810 (S.C. Ct. App. 1986).

The "stream of commerce" requirement is consistent with the application of sec. 402A in Wisconsin. In *Barter v. General Motors Corp.,* 70 Wis. 2d 796, 235 N.W.2d 523 (1975), the supreme court applied the doctrine to a third-party sale and rental. Krager manufactured a motor home which it sold to Allen Industries. Allen Industries sold the home to Dawson who rented it to Otis. Otis and other passengers were injured when a wheel came off the vehicle. The court found Krager strictly liable for Otis' injuries, although he had not purchased the motor home from Krager.

The *Barter* court concluded that:

> While the factor of sale is important in establishing the underlying predicate that the seller, by marketing his product, undertook and assumed the special responsibility toward the consuming public, the sale is relevant only to the extent that it is probative of the "business" of the manufacturer or seller. It is the "business of selling" that is significant.

*Id.* at 803, 235 N.W.2d at 526. *See also Howes v. Hansen,* 56 Wis. 2d 247, 255, 201 N.W.2d 825, 829 (1972) (seller found liable for bystander's injuries, although there was no sale between the defendant and

the plaintiff). Therefore, the sale of the product is not important as long as the defendant is in the business of selling such a product and it placed the product in the "stream of commerce."

In this case, the start-in-gear interlock device had been salvaged by Kroggel from a motor that was returned on warranty. OMC sold the original motor with the interlock system and by so doing placed the interlock system in the "stream of commerce." Also, after Kroggel had installed the interlock system, the motor tester at OMC inspected the motor and determined that it met OMC's standards. The motor was then returned to Mulhern with the approval of OMC's agent. Therefore, although OMC did not sell the motor to Mulhern, it placed the motor "in the stream of commerce" by other means.

We conclude that the trial court correctly applied the rule of strict liability to this case.

## FEDERAL PREEMPTION

OMC argued, for the first time on postverdict motions, that the Federal Boat Safety Act of 1971, 46 U.S.C. secs. 4301–4311 (1984) [previously numbered under 46 U.S.C. 1451–1489], preempted Mulhern's strict liability claim. OMC contends that because it met the federal regulations specified in 33 C.F.R. section 183.701, strict liability in tort does not apply. We disagree.

Federal preemption deprives a state court of subject matter jurisdiction. Therefore, the issue may be raised at any time, including for the first time on appeal. *Chicago & N.W. Ry. v. La Follette,* 27 Wis. 2d 505, 512, 135 N.W.2d 269, 273 (1965); *Moreland Corp.*

*v. Retail Store Employees Union,* 16 Wis. 2d 499, 502, 114 N.W.2d 876, 878 (1962).

The supremacy clause of the Constitution gives Congress the power to preempt state law. U.S. Const. art. VI, cl. 2; *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208 (1985). Federal law may preempt state law in three ways:

[1] when congress explicitly defines the extent to which it intends to preempt state law;

[2] when congress indicates an intent to occupy an entire field of regulation;

[3] and when state law conflicts with federal law and compliance with both laws is impossible.

*Liberty Homes, Inc. v. DILHR,* 125 Wis. 2d 492, 511, 374 N.W.2d 142, 151 (Ct. App. 1985), *affirmed,* 136 Wis. 2d 368, 401 N.W.2d 805 (1987). An appellate court is required to determine whether Congress intended to supersede state authority. *See id.* at 511–12, 374 N.W.2d at 152.

Section 4306 of the Federal Boat Safety Act specifically states:

**Federal preemption**

Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of *a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment* (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the

State) that is not identical to a regulation pre-
scribed under section 4302 of this title. [Emphasis
added.]

OMC argues that Congress has preempted the field of
regulating boat safety requirements for manufactur-
ers and therefore precludes the application of the
state strict liability claim. However, we read the Act
differently.

The purpose of the Act was to establish uniform
minimum safety standards for boats and associated
equipment. S. Rep. No. 248, 92nd Cong., 1st Sess,
*reprinted in* 1971 U.S. Code Cong. & Admin. News
1333, 1333. The safety standards are to be promulgat-
ed by the Secretary of Transportation. *Id.* (the Coast
Guard operates within the Department of Transporta-
tion).

The Federal Boat Safety Act does not expressly
preempt state tort law. The Act states that:
"[c]ompliance with this chapter or standards, regula-
tions, or orders prescribed under this chapter does not
relieve a person from liability at common law or under
State law." 46 U.S.C. sec. 4311(g) [previously 46 U.S.C.
1489 Savings Provision]. *See Rubin v. Brutus Corp.,*
487 So. 2d 360, 363 (Fla. Dist. Ct. App. 1986), *review
denied,* 500 So. 2d 543 (Federal Boat Safety Act held
not to be the exclusive basis for manufacturer's
liability). *See also Gryc v. Dayton-Hudson Corp.,* 297
N.W.2d 727, 737 (Minn. 1980), *cert. denied,* 449 U.S.
921 (1980) (The Consumer Products Safety Act, 15
U.S.C. sec. 2051, had a similar provision which did not
exclude private remedies).

OMC also argues that Congress impliedly
preempted the strict liability state remedy because
compliance with both the federal act and the state law

would be impossible. OMC alleges that the Coast Guard regulation, codified in 33 C.F.R. sec. 183.710,[3] leaves the state law inapplicable. However, section 183.710 applies only to "outboard motors and starting controls manufactured after August 1, 1982, and to manufacturers, distributors or dealers installing such equipment after that date." *Id.* at sec. 183.701. Because the start-in-gear device in Mulhern's motor was manufactured and installed prior to 1982, this section is inapplicable.

██

Even if the regulation had been applicable, compliance with the federal regulation would not have preempted the state strict liability action because the Act and the regulation are only *minimum* safety standards which do not provide private tort remedies. Also, compliance with federal regulations does not necessarily preclude a finding of strict liability. *See e.g., Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238 (1984) (compliance with the Atomic Energy Act, 42 U.S.C. sec. 2021, did not preclude state tort remedies for

---

[3]Section 183.710, in part, provides:

Start-in-gear protection required.

(a) Any outboard motor which is capable of developing a static thrust of 115 pounds or more at any motor operating speed with any propeller or jet attachment recommended for or shipped with the motor by the manufacturer, must be equipped with a device to prevent the motor being started when controls are set so as to attain that thrust level, as follows:

(1) Outboard motors designed for local starting must have a built-in start-in-gear protection device.

(2) Outboard motors designed for remote starting must have either a build-in start-in-gear protection device or be installed with remote starting controls containing this device. An outboard motor designed for remote starting that does not have a built-in start-in-gear protection device must, at the time of sale, have a tag or label attached at the location of the control connection . . . .

nuclear radiation injuries); *Gryc,* 297 N.W.2d at 734–35 (compensatory and punitive damages not precluded by preemption clause).

We conclude that the Federal Boat Safety Act did not preempt the strict liability claim in this action.

## JURY INSTRUCTIONS AND VERDICT QUESTIONS

OMC argues that the trial court abused its discretion when it limited the jury instructions and verdict questions[4] to the limited throttle interlock system rather than the motor as a whole. We disagree.

---

[4]The pertinent special verdict questions were:

*QUESTION NO. 1:* Did Outboard Marine Corp. (hereafter "OMC"), as a part of its business, manufacture the limited throttle start-in-gear interlock mechanism on the outboard motor involved in the Mulhern accident?

*QUESTION NO. 2:* If you have answered Question No. 1 "yes," then answer this question:

Did the limited throttle start-in-gear interlock mechanism on the outboard motor involved in the accident reach James Mulhern without substantial change in its original condition?

*QUESTION NO. 3:* If you have answered both Question 1 and 2 "yes," then answer this question:

Was the limited throttle start-in-gear interlock mechanism on the outboard motor involved in the Mulhern accident, when it left the possession of OMC, in such a defective condition as to be unreasonably dangerous to a prospective user?

*QUESTION NO. 4:* If you have answered Question No. 3 "yes," then answer this question:

Was such defective condition a cause of the plaintiff's injuries?

*QUESTION NO. 5:* Was OMC negligent with respect to the design and manufacture of the limited throttle start-in-gear interlock mechanism on the outboard motor involved in the accident?

The form of a verdict question is within the sound discretion of the trial court, and this court will not interfere so long as all material issues of fact are covered by appropriate questions. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 445–46, 280 N.W.2d 156, 160 (1979).

The central issue at trial was whether OMC's limited throttle start-in-gear interlock device was defective because it allowed more than 115 pounds of thrust to be produced when the motor was started in gear. Mulhern argued that the start-in-gear design caused his injuries. However, OMC argued that the mixture of parts and the substantial change to the motor caused Mulhern's injuries.

The component part theory was established in *City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 Wis. 2d 641, 207 N.W.2d 866 (1973). There the court held that:

> Where there is no change in the component part itself, but it is merely incorporated into something larger, and where the cause of harm or injury is found, as here, to be a defect in the component part, we hold that, as to the ultimate user or consumer, the strict liability standard applies to the maker and supplier of the defective component part.

*Id.* at 649, 207 N.W.2d at 869–70.

The Mulherns submitted the case on the component part theory. They argued that the start-in-gear mechanism was defective and unreasonably dangerous. We conclude that the trial court did not abuse its discretion when it limited the jury instructions and

619

verdict questions to the start-in-gear interlock mechanism.

## ADMISSION OF EVIDENCE

After Mulhern's accident, he sold the 1957 thirty-five horsepower motor to his co-worker, Adam Hausknecht (Hausknecht). Believing that the motor was designed to start in neutral only, Hausknecht attempted to repair the limited throttle start-in-gear mechanism on the motor. He purchased and installed new parts in the motor while attempting to fix the device. Because the motor continued to start in gear, Hausknect installed an electric start mechanism and removed the start-in-gear device.

After this action was commenced, OMC inspected the motor and discovered that the interlock device was missing. Mulhern's counsel instructed Kroggel to reinstall an OMC start-in-gear interlock mechanism so that the device could be tested by Mulhern's expert, Bobbie Richardson (Richardson), a professor of mechanical and electrical engineering at Marquette University.

At trial, OMC objected to any evidence of the tests conducted by Richardson. The trial court overruled the objection and admitted the evidence. On appeal, OMC argues that the trial court abused its discretion in admitting the tests. We disagree.

Whether to admit relevant evidence is within the sound discretion of the trial court, after balancing probative value and possible prejudice. An appellate court will not interfere with the trial court's decision if it exercised appropriate discretion. *Independent*

620

*Milk Producers Co-Op v. Stoffel,* 102 Wis. 2d 1, 12, 298 N.W.2d 102, 107 (Ct. App. 1980).

Evidence is relevant if it has a tendency to make a material fact in the case "more probable or less probable than it would be without the evidence." Sec. 904.01, Stats. All relevant evidence will be admitted unless the probative value of the evidence is substantially outweighed by possible prejudice. Sec. 904.03, Stats.

The tests conducted on the motor were relevant to explain the defective design of the start-in-gear interlock system. Pretrial experiments may be admitted "[i]f enough of the obviously important factors in the case are duplicated in the experiment, and if the failure to control other possibly relevant variable is explained... ." *Maskrey v. Volkswagenwerk Aktiengesellschaft,* 125 Wis. 2d 145, 165, 370 N.W.2d 815, 825 (Ct. App. 1985). The jury was informed, through testimony, that Hausknecht had removed the original interlock mechanism and that Kroggel reinstalled a new mechanism for the purpose of performing the tests.

Mulhern did not argue that the interlock system, which had been in his motor at the time of the accident, was defective because it did not work according to design. He contended that the design itself was defective. Thus, as long as Mulhern sufficiently duplicated the accident motor, and tests were relevant and not prejudicial. The trial court did not abuse its discretion.

## PUNITIVE DAMAGES

The jury awarded Mulhern $150,000 in punitive damages. OMC argues that there was no credible evidence to support the award of punitive damages. We disagree.

The trial court must determine as a matter of law whether there is sufficient credible evidence to allow a jury to find that punitive damages are warranted. *Walter v. Cessna Aircraft Co.,* 121 Wis. 2d 221, 231, 358 N.W.2d 816, 821 (Ct. App. 1984). "Because it is a question of law for the trial court, so it is with this court. We owe no deference to the trial court holding." *Id.*

To be awarded punitive damages, the plaintiff must establish by clear and convincing evidence that the defendant's conduct was "willful or wanton, in a reckless disregard of right or interests." *Brown v. Maxey,* 124 Wis. 2d 426, 433, 369 N.W.2d 677, 681 (1985). An appellate court will uphold an award of punitive damages if there is any evidence from which the jury could have reasonably concluded that the defendant's conduct was "outrageous." *Id.* The evidence will be construed in a manner most favorable to the jury verdict. *Id.*

Punitive damages are designed to punish the wrongdoer and to act as a deterrent. *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 201, 342 N.W.2d 37, 54 (1984), *cert. denied,* 469 U.S. 826 (1984). Furthermore, punitive damages may be recovered in a product liability suit if the defendant's conduct was "outrageous." *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 271,

294 N.W.2d 437, 444 (1980). In *Wheeler v. General Tire & Rubber Co.,* 142 Wis. 2d 798, 419 N.W.2d 331 (Ct. App. 1987), this court recognized several factors to be considered in determining whether a manufacturer's conduct was outrageous so as to justify a punitive damage award:

> (1) the existence and magnitude in the product of danger to the public;
>
> (2) the manufacturer's awareness of the magnitude of danger;
>
> (3) and the cost and feasibility of reducing the danger to an acceptable level.

*Id.* at 818–19, 419 N.W.2d at 339 (quoting *Walter,* 121 Wis. 2d at 228–29, 358 N.W.2d at 820).

Essentially, a plaintiff must establish that the manufacturer had knowledge of the defect and that the manufacturer was at fault because it failed to take steps to remedy the harm in face of serious danger. *Walter,* 121 Wis. 2d at 227–28, 358 N.W.2d at 819–20. At trial, Mulhern established that as early as 1958, OMC internally recognized that the thirty-five horsepower motors caused a high acceleration when started, and that dealers and users should be warned that the motor should always be started in neutral. Despite this knowledge, OMC did not explain the purpose of the start-in-gear mechanism or its dangers in any owners or service manuals. Because of OMC's failure to include an explanation of the device in its publications, owners of OMC motors and OMC employees were unaware that the mechanism was installed to allow the motor to be started in gear.

Furthermore, OMC was aware that a neutral only mechanism was available, since it used the device on its larger motors. The neutral only mechanism would have completely eliminated the danger which the start-in-gear device presented. Also, the dangers to users of the motor were serious because of unstable conditions of the water.

We conclude that there was sufficient evidence to support the punitive damage award.

## FRIVOLOUS CLAIMS

Kroggel cross appeals the judgment dismissing OMC's third-party complaint against him and denying his postverdict motion for reasonable costs and attorney's fees, pursuant to sec. 814.025, Stats. The trial court concluded that OMC's action was not frivolous.

Under sec. 814.025(3)(b), Stats., a claim is frivolous if the trial court finds that "[t]he party or the party's attorney knew, or should have known, that the action ... was without any reasonable basis in law or equity and could not be supported by good faith argument for an extension, modification or reversal of existing law." When determining whether an action is frivolous, the issue is not whether the party will or can prevail, but rather whether the party's position is so indefensible that it is frivolous and the party should have known it. *Sommer v. Carr,* 99 Wis. 2d 789, 797, 299 N.W.2d 856, 859 (1981).

Whether a reasonable attorney would or should have concluded that a claim is without reasonable basis in law or equity presents a mixed question of law and fact. *Stoll v. Adriansen,* 122 Wis. 2d 503, 513, 362

N.W.2d 182, 187 (Ct. App. 1984). The question of what a reasonable attorney or litigant would or should have know with regard to the facts requires the trial court to ascertain the facts. This is a question of fact. *Id.* at 513, 362 N.W.2d at 187–88. An appellate court will not upset a trial court's findings of fact unless they are clearly erroneous. *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983). However, a question of law is presented when construing the legal significance of those findings, in terms of whether knowledge of those facts would lead a reasonable attorney or litigant to conclude that the claim was frivolous. *Stoll,* 122 Wis. 2d at 513, 362 N.W.2d at 188.

In OMC's third-party action, it alleged that Kroggel had entirely rebuilt Mulhern's motor in a negligent manner and that the changes to the motor caused Mulhern's injuries. To establish that Kroggel was negligent, OMC had to prove that Kroggel failed to use reasonable care under the circumstances. At trial, OMC presented evidence of the changes made by Kroggel. The trial court found that OMC presented evidence in accordance with its legal theory. Based on its finding, the trial court made a legal conclusion that OMC acted reasonably in bringing the action against Kroggel and therefore the claim was not frivolous.

This court reviews questions of law independently and without deference to the trial court's decision. *Ball,* 117 Wis. 2d at 537, 345 N.W.2d at 394. Here, OMC presented evidence to establish that Kroggel had been negligent and that the changes in the motor had caused Mulhern's injuries. Therefore, we conclude that the action was not frivolous and affirm the trial court's decision.

## CONCLUSION

In summary, we determine that: (1) The trial court was correct in applying strict liability to this case; (2) the Federal Boat Safety Act does not preempt the state tort remedy of strict liability; (3) the trial court did not abuse its discretion when it limited the jury instructions and special verdict question to the start-in-gear interlock device; (4) the trial court did not abuse its discretion in admitting evidence of the test conducted by Mulhern's expert, Richardson; (5) there is sufficient credible evidence to uphold the punitive damage award; and (6) OMC's third-party action against Kroggel was not frivolous. We therefore affirm the judgment.

*By the Court.*—Judgment affirmed.

FINE, J. *(concurring)*. I join in the court's decision but write separately on the issue of whether the defense of federal pre-emption is waived when it is not raised before the trial court. The court correctly notes that the Wisconsin Supreme Court has held that federal pre-emption is jurisdictional and that the issue may be raised at any time. *Chicago & N.W. Ry. v. La Follette*, 27 Wis. 2d 505, 512, 135 N.W.2d 269, 273 (1965). The Wisconsin cases, however, do not specifically distinguish between "forum" pre-emption, which goes to the state court's jurisdiction and may not be waived, and "standards" pre-emption, which applies equally in state or federal court and, according to the rule in other jurisdictions, may be waived. Even though ours is a "standards" pre-emption case, we are bound by Wisconsin Supreme Court precedent.

The doctrine of federal pre-emption rests on the "supremacy clause" of article VI of the United States

Constitution. *International Longshoremen's Ass'n., AFL-CIO v. Davis,* 476 U.S. 380, 388 (1986). That clause provides that the "constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

Federal pre-emption is a double-barreled doctrine. First, it can deprive a state court of jurisdiction to hear a particular matter when Congress has "vest[ed] exclusive jurisdiction over [a particular] controversy in another body." *Davis,* 476 U.S. at 388. Thus, as *Davis* explains, "[i]t is clearly within Congress' powers to establish an exclusive federal forum to adjudicate issues of federal law in a particular area that Congress has the authority to regulate under the Constitution." *Id.* When Congress specifies an exclusive federal forum, "state jurisdiction is extinguished." *Id.* at 391. Since a court's subject matter jurisdiction may not be conferred by the parties, "forum" pre-emption is not waivable. *Moreland Corp. v. Retail Store Employees Union,* 16 Wis. 2d 499, 502, 114 N.W.2d 876, 878 (1962).

The second barrel of pre-emption is Congress' power to "lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties," state or federal. *Garner v. Teamsters,* 346 U.S. 485, 490 (1953); *see also Kaski v. First Fed. Sav. & Loan Ass'n of Madison,* 72 Wis. 2d 132, 140–42, 240 N.W.2d 367, 372–73 (1976). This "standards" pre-emption "is ordinarily a federal defense to the plaintiff's suit," *Metropolitan Life Ins. Co. v. Taylor,* 107 S. Ct. 1542, 1546 (1987), and will be waived if not asserted in the trial court. *Hughes v.*

627

*Blue Cross of N. Calif.,* 245 Cal. Rptr. 273, 282 (Ct. App. 1988), *review granted,* 248 Cal. Rptr. 172 (1988) (see California Rules of Court, Rule 976). *Hughes'* recognition that a defense based on a rule of law within the ambit of "standards" pre-emption may be waived is consistent with the Wisconsin rule that affirmative defenses may not be raised for the first time on appeal. *See* Rule 802.06(2), Stats.; *Jax v. Jax,* 73 Wis. 2d 572, 583–84, 243 N.W.2d 831, 838 (1976); *Bushweiler v. Polk County Bank,* 129 Wis. 2d 357, 361, 384 N.W.2d 717, 719 (Ct. App. 1986).

As the court here recognizes, the Wisconsin Supreme Court has permitted a "standards" pre-emption-based defense to be raised for the first time on appeal. *La Follette,* 27 Wis. 2d at 512, 135 N.W.2d at 273. However, the only authority *La Follette* cites to support that proposition is *Moreland,* which, however, was a "forum" pre-emption case. *LaFollette*'s proposition thus rests on tenuous footings and should be re-examined by the Wisconsin Supreme Court in an appropriate case.