ESTATE OF Richard COOK, by the Personal Representative, Linda J. Cook, and Linda J. Cook, individually, Plaintiffs-Appellants, †

Joshua R. COOK, Jessica A. Cook, and Jennifer L. Cook, minors, by their Guardian ad Litem, Roy E. Wagner, Plaintiffs,

v.

GRAN-AIRE, INC., and ABC Insurance Company, Defendants-Respondents.

Court of Appeals

*No. 93–0876. Oral argument November 18, 1993.—Decided February 9, 1994.*

(Also reported in 513 N.W.2d 652.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Timothy J. Aiken* and *Kelly L. Centofanti* of *Aiken & Scoptur, S.C.* of Milwaukee. There was oral argument by *Timothy J. Aiken*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Eric J. Van Vugt*, *Margaret C. Kelsey* and *Nora M. Platt* of *Quarles & Brady* of Milwaukee. There was oral argument by *Eric J. Van Vugt*.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J. This case concerns whether strict products liability law applies in a fatal airplane crash that killed an aerobatics flight student and his instructor, an employee of the airplane's owner. In *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967), our supreme court adopted strict products liability for sellers and manufacturers who place a defective and unreasonably dangerous product in the stream of commerce. In *Kemp v. Miller,* 154 Wis. 2d 538, 453 N.W.2d 872 (1990), our supreme court extended strict liability to lessors. We hold that, under *Dippel* and *Kemp,* the defective product must leave the possession and control of the seller, manufacturer or lessor and be *in the possession and control of the consumer.* Because the airplane never left the possession or control of the owner, and the owner was not engaged in leasing the product in the first place, the principles of strict products liability do not apply here. We affirm.

The stipulated facts in this case are as follows. Gran-Aire, Inc. is a company engaged in the business of flight instruction, charter service and plane maintenance. Gran-Aire purchased a Bellanca Decathlon in 1986 from a private owner and, from that time forward, used it only for aerobatics flight instruction. While Gran-Aire did not lease out the Bellanca, it did regularly lease *other* airplanes as part of its charter service business. Those planes were leased to licensed and student pilots; Gran-Aire charged an hourly fee based on a plane's value and operating costs.

The Bellanca was manufactured in 1980 by Bellanca Aircraft Corporation, which was liquidated in 1982 in bankruptcy proceedings. It was a two-seat airplane with a full set of controls for each position; the airplane could be controlled from either position. Richard Cook, a licensed pilot, took aerobatic flight

instruction from Gran-Aire. When doing so, he never flew in the Bellanca alone but was always accompanied by an instructor. In the course of instruction, the instructor would occasionally take over the controls to demonstrate a maneuver or technique. Gran-Aire charged Cook a separate fee for the use of the Bellanca during instruction (not denominated as rental) and for the instructor's time—$65 per hour for the plane and $29 per hour for the instructor.

Cook and a flight instructor employed by Gran-Aire were killed when the Bellanca crashed because the right wing separated from the fuselage during flight. The National Transportation Safety Board concluded that improper welding techniques during the manufacturing process of the plane caused fatigue cracks in the structure which should have kept the wing attached to the plane.

Cook's estate, widow and minor children by their guardian ad litem (the estate) brought a complaint against Gran-Aire sounding in negligence and strict products liability. The estate thereafter filed a motion for declaratory relief asking the circuit court to decide whether it could bring a strict products liability action against Gran-Aire. The estate contended that Gran-Aire was subject to liability under the rationale announced in *Kemp*. The circuit court held that "Gran-Aire was not engaged in the business of leasing [the Bellanca] for the sole possession, control and enjoyment of [Cook], and therefore, not strictly liable for any alleged defective condition which caused the fatal crash."

■

We granted the estate's petition to review the non-final order. In addressing whether the trial court's ruling was correct, we initially note that the applica-

tion of strict liability principles to an undisputed set of facts is a question of law which we decide without deference to the trial court. *Rolph v. EBI Cos.*, 159 Wis. 2d 518, 528, 464 N.W.2d 667, 670 (1991).

We begin with the law. In *Dippel,* our supreme court wrote that there are five conditions necessary to recovery under strict liability. They are:

> (1) that the product was in defective condition when it *left the possession or control of the seller,* (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the *seller engaged in the business of selling such product* or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it. [Emphasis added.]

*Dippel*, 37 Wis. 2d at 460, 155 N.W.2d at 63. Thus, under *Dippel*, the product must have "left the possession or control" of the seller and the seller must have been engaged in the business of selling "such" product. These same factors were restated in *Kemp* where the supreme court extended strict liability to the lessors. Basically, all *Kemp* does is allow the insertion of the word "lessor" in place of the word "seller" when applying the *Dippel* test. In all other respects, the *Dippel* factors remain the law in this state.

Gran-Aire argues that it was not the manufacturer of the plane, the seller or its lessor. Rather, it provided a service—aerobatic flight training; the Bellanca was used as part of this service. Thus, the fourth *Dip-*

*pel/Kemp* prong is not satisfied; Gran-Aire was not engaged in the business of leasing the Bellanca. Regarding the first *Dippel/Kemp* prong, the plane never left the complete possession and control of Gran-Aire since the flight instructor was in the plane at the time of the accident and at least shared control of the plane.

The estate maintains, however, that to view the two *Dippel/ Kemp* prongs in the manner suggested is too narrow in light of other products liability case law. Regarding the fourth prong, the estate apparently contends that emphasizing that part of the *Dippel/Kemp* language which requires the seller or lessor to be engaged in the business of selling or leasing *such* product is misleading. Instead, the estate prefers to limit the fourth prong to asking whether the lessor is "engaged in the business of leasing." *Kemp*, 154 Wis. 2d at 558, 453 N.W.2d at 880. It seemingly does not matter that the lessor must be engaged in leasing "such" product; only that the lessor be engaged in leasing, period.

In support of this reading of the fourth prong, the estate cites a case from Missouri to say that so long as the product is being used as part of the profit motive of the leasing business, the product is subject to strict products liability. *Gabbard v. Stephenson's Orchard, Inc.*, 565 S.W.2d 753, 757-58 (Mo. Ct. App. 1978) (holding that where an apple orchard furnished ladders for customers to use, the ladders were part of the sale of apples). This is because the lessor is using the product as an integral part of its commercial lease business. Thus, whether the defective product is part of the leasing business depends not upon whether the product was itself leased, but upon whether the product was an integral part of a leasing business.

336

Applying its view of the law, the estate notes that Gran-Aire was involved in the business of leasing airplanes. A Gran-Aire executive admitted that the flight school was the principal ingredient in providing Gran-Aire with a stable client base with which to lease planes. Therefore, the defective Bellanca product was an integral part of the leasing business since it brought customers to the leasing business. When Gran-Aire put the Bellanca in the air with customers, it was, in part, to help the leasing business. Any injury to consumers as part of the leasing business is subject to strict products liability.

The estate claims that there is a Wisconsin case on point which broadens the *Dippel/Kemp* prerequisite demanding that the lessor be engaged in the business of selling or leasing *such* product. In *Mulhern v. Outboard Marine Corp.*, 146 Wis. 2d 604, 608-09, 432 N.W.2d 130, 132 (Ct. App. 1988), Outboard Marine provided Mulhern, free of charge, with a salvaged defective motor part designed and manufactured by it. The part was then installed free of charge by Mulhern's brother-in-law, an employee of the business, in a motor not purchased from the business.

The *Mulhern* court cited *Barter v. General Motors Corp.*, 70 Wis. 2d 796, 235 N.W.2d 523 (1975), where our supreme court viewed the "sale" as "establishing the underlying predicate that the seller, by marketing his product, undertook and assumed the special responsibility toward the consuming public." *Mulhern*, 146 Wis. 2d at 613, 432 N.W.2d at 134 (citing *Barter*, 70 Wis. 2d at 803, 235 N.W.2d at 526). The *Mulhern* court held that "the sale of the product is not important as long as the defendant is in the business of selling such a product and it placed the product in the 'stream of commerce.' " *Id.* at 614, 432 N.W.2d at 134. The court

concluded that although the defendant did not sell the motor to Mulhern, it placed the motor "in the stream of commerce' by other means." *Id.*

The estate observes that even though Outboard Marine did not sell the defective part to the public, it was held liable. The estate reasons that this is because Outboard Marine was in the business of placing motor parts into the stream of commerce and profiting from it. It was therefore responsible for *any* product produced *as part of the profit motive* of the business. The estate then claims that, likewise, Gran-Aire's flight instruction business was used to further the goodwill of the leasing business and was therefore part of the Gran-Aire leasing business.

We are unpersuaded that *Mulhern* stands for the broadening of the *Dippel/Kemp* language in prong four. Outboard Marine was in the business of producing interlock devices with the intent to place these devices on the anonymous market to be sold to the remote consumer. In fact, the *Mulhern* court duly noted that Outboard Marine had in fact sold the interlock device, only in a different motor. Therefore, Outboard Marine had indeed placed the particular part involved into the stream of commerce. The *Mulhern* court reasoned that it was not important whether Outboard Marine actually sold the part to Mulhern; rather, the important factor was whether the device was placed into the stream of commerce by any "other means." Since the part was produced with the intention to place it into the stream of commerce and had actually been sold as such, it was a product that was on the market. Once on the market, strict liability applied. This is the meaning behind the "other means" language in *Mulhern*.

Cases from other jurisdictions support the view that the product itself must be placed on the market. In *Keen v. Dominick's Finer Foods, Inc.*, 364 N.E.2d 502, 504-05 (Ill. App. Ct. 1977), the court held that a grocery store should not be held strictly liable in tort for an alleged defect in a shopping cart because the cart never left the control of the store and was never placed on the market for the remote consumer. Similarly, in *Dixon v. Four Seasons Bowling Alley, Inc.*, 424 A.2d 428, 430-31 (N.J. Super. Ct. App. Div. 1980), the court held that a bowling alley could not be held strictly liable for a bowling ball which chipped and injured the plaintiff. Central to both cases is that each of the defendants was primarily providing a service, to which the temporary provision of goods was merely incidental. We acknowledge that *Gabbard* (the Missouri apple orchard case) appears to hold a contrary view. However, we are convinced that the present state of the law in Wisconsin is as we have stated.

Another *Dippel/Kemp* prong that is missing here is the first one. This prong requires that, before strict products liability may attach, the defective product must have left the possession or control of the seller or lessor. At oral argument, the estate took issue with defining "stream of commerce" as the point at which the business relinquishes possession and control and the consumer buys or leases on the market so as to take over total possession and control. It cited *Ransome v. Wisconsin Elec. Power Co.*, 87 Wis. 2d 605, 275 N.W.2d 641 (1979). In *Ransome*, the plaintiffs suffered fire damage when a transformer exploded releasing between 1000 and 4000 volts of electricity to pass through their meter and into their house. *Id.* at 622, 275 N.W.2d at 649. It was undisputed that the plain-

tiffs only purchased the normal voltage transmission of 120 to 240 volts and not the excess damaging electricity.

The estate argues that the electric company never parted with the voltage. It controlled the electricity the whole time. The plaintiff in *Ransome* never possessed or controlled the electricity. Yet, the *Ransome* court determined the case to be covered under strict products liability. The estate reasons that possession and control cannot be the answer to the question of how to define stream of commerce.

We do not agree with the estate's reading of *Ransome*. All of the electricity was released into the stream of commerce because it all passed through the electric meter. *See Ransome*, 87 Wis. 2d at 623, 275 N.W.2d at 649. Therefore, the *Ransome* plaintiffs had as much control over all of the electricity as any consumer of electricity can. As *Mulhern* indicates, the exchange of money is not necessarily a controlling factor for the stream of commerce requirement. *See Mulhern*, 146 Wis. 2d at 614, 432 N.W.2d at 134. We conclude that *Ransome* does not dilute the first *Dippel/Kemp* prong.

Alternatively, the estate claims that Cook *did* have possession and control of the Bellanca because the relationship between Cook and Gran-Aire was a formal lessor-lessee arrangement. In a lessor-lessee relationship, the lessor relinquishes physical possession of property to the lessee, while retaining legal title to the property. *Manor v. Hanson*, 120 Wis. 2d 582, 587, 356 N.W.2d 925, 927 (Ct. App. 1984), *rev'd on other grounds*, 123 Wis. 2d 524, 368 N.W.2d 41 (1985). A lease creates a bailment that entitles the bailee to exercise all possessory rights over the property. *Id.*

340

The estate argues that Cook paid a separate fee for the Bellanca and exercised joint control with the instructor over the Bellanca. The estate therefore contends that a lessor-lessee relationship existed and strict products liability applies under the *Kemp* case.

However, the undisputed facts of record show that Cook did not lease the plane and did not obtain the right to possess the Bellanca such that he could exclude Gran-Aire or override the instructor's direction as to its use. The instructor was the "pilot in command" and Cook was the student. Cook did not enjoy a right to control the Bellanca equal to the instructor's. The Bellanca was owned by Gran-Aire, the instructor's employer. During Cook's instruction time, any control Cook had over the plane was at the instructor's direction. We conclude that no lessor-lessee relationship existed here.

*By the Court.*—Order affirmed.