Cheryl LOVERIDGE, Plaintiff-Respondent-Cross Petitioner,

v.

Dale L. CHARTIER, Defendant-Respondent-Co-Appellant,

STATE FARM FIRE & CASUALTY COMPANY, a foreign corporation, Defendant-Appellant-Petitioner.

Supreme Court

*No. 88–2107. Argued November 27, 1990.—Decided April 10, 1991.*

(Also reported in 468 N.W.2d 146.)

150

160

For the defendant-appellant-petitioner there were briefs by *William J. Katt, Jonathan M. Ray* and *Kasdorf, Lewis & Swietlik, S.C.,* Milwaukee and oral argument by *Mr. Katt.*

For the plaintiff-respondent-cross petitioner there were briefs by *James J. Winiarski,* Milwaukee and oral argument by *James J. Winiarski.*

For the defendant-respondent-co-appellant there was a brief by *Thomas J. Flanagan, Hope K. Olson* and *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.,* Milwaukee and oral argument by *Mr. Flanagan.*

LOUIS J. CECI, J. This case is before the court on a petition and cross-petition for review of an unpublished decision of the court of appeals, dated December 13, 1989, which affirmed in part and reversed in part a judgment of the circuit court for Milwaukee County, Rudolph T. Randa, Circuit Judge. The circuit court entered judgment pursuant to a jury verdict against Dale L. Chartier (Chartier) and State Farm Fire & Casualty Company (State Farm) in the amount of $75,284.74. The jury awarded Cheryl Loveridge (Loveridge) $67,500.00 in compensatory damages and $20,000.00 in punitive damages. The compensatory damage award was reduced under sec. 895.045, Stats., because the jury found Chartier 75 percent causally negligent, Youthful Shoes, Inc. (a defendant that settled before trial) 5 percent causally negligent, and Loveridge 20 percent contributorily negligent. The court of appeals reversed the award of punitive damages, but affirmed the judgment of the circuit court in all other respects.

Four issues are presented for review.[1] The first issue is whether a court may infer that an adult intends to

---

[1] We leave for another day State Farm's argument that the

harm a 16- or 17-year-old as a matter of law when the adult has consensual sexual contact with the 16- or 17-year-old merely because the adult's conduct constitutes a misdemeanor offense. We hold that a court cannot make such an inference as a matter of law.

The second issue is whether the circuit court's instruction to the jury on the intentional-acts exclusion of the insurance policy was erroneous and prejudicial. We hold that the instruction was not erroneous under the facts of this case.

The third issue is whether public policy prevents insurance coverage for negligent transmission of sexually transmitted diseases. We hold that public policy does not prevent such coverage.

The fourth issue is whether the circuit court properly submitted the issue of punitive damages to the jury. We hold that the circuit court erred in submitting the issue of punitive damages to the jury.

This is a negligence cause of action for personal injuries that arose as a result of a consensual sexual relationship between Loveridge and Chartier. The facts relevant to this appeal are not in dispute. Chartier was Loveridge's supervisor at a Stride Rite shoe store owned by Youthful Shoes, Inc. From April to August of 1984, Chartier and Loveridge engaged in approximately 15 acts of consensual sexual contact including both intercourse and cunnilingus. Loveridge consented to those acts. Chartier never made any threats, promises, or misrepresentations to induce Loveridge to engage in the acts.

principle of fortuity precludes insurance coverage under the facts of this case. *See generally Wirth v. Ehly,* 93 Wis. 2d 433, 443–44, 287 N.W.2d 140 (1980) (noting that this court generally does not consider issues which were not raised below).

Loveridge turned 17 on April 29, 1984. Chartier turned 44 on May 11, 1984. Accordingly, Chartier violated secs. 944.15(2) and 944.17(2)(b), Stats. 1983-84[2] by engaging in sexual contact with Loveridge notwithstanding her consent. However, Chartier was never criminally charged for engaging in the acts in question.

In July of 1984, Loveridge was diagnosed as having the herpes simplex virus. Chartier had a history of cold sores and had one on his mouth at least one of the times he performed cunnilingus on Loveridge. The record shows that herpes can be spread from a cold sore on the mouth of one person to the genital area of another person during cunnilingus. Chartier testified at trial that he never received medical care for his cold sores. Chartier further testified that at the time of his sexual contact with Loveridge he thought there was a vague connection between cold sores and the herpes simplex virus but that he did not know that the herpes virus could be transmitted by cold sores.

---

[2]All statutory references throughout this opinion will be to the 1983-84 statutes unless otherwise noted.

Section 944.15(2), Stats., provides as follows:

**944.15 Fornication . . ..**
 **(2)** Whoever has sexual intercourse in public or whoever has sexual intercourse with a minor who is 16 years old or older but younger than 18 years old and who is not his or her spouse is guilty of a Class A misdemeanor.

Section 944.17(2)(b), Stats., provides as follows:

**944.17 Sexual gratification . . ..**
 **(2)** Whoever does any of the following is guilty of a Class A misdemeanor:

 . . .

 **(b)** Commits an act of sexual gratification with a minor who is 16 years old or older but younger than 18 years old and who is not his or her spouse, involving the sex organ of one person and the mouth or anus of another.

163

On July 23, 1986, Loveridge commenced this action against Chartier and State Farm. On May 5, 1988, State Farm brought a motion for summary judgment on the grounds that the intentional-acts exclusion of the homeowners insurance policy that it had issued to Chartier precluded insurance coverage for Loveridge's injuries. The circuit court heard and decided the motion on May 31, 1988. State Farm argued that the court should infer that Chartier intended to injure Loveridge as a matter of law because Chartier's sexual contact violated criminal statutes designed to protect minors. The circuit court denied the motion. The court reasoned that it could not infer intent to injure as a matter of law and concluded that the evidence did not establish that Chartier intended or expected to give Loveridge the herpes simplex virus or harm her in any other manner.

State Farm renewed this motion at the instruction conference on July 22, 1988. The circuit court denied the motion again for the same reasons. On different grounds, State Farm objected to the circuit court's instruction on the intentional-acts exclusion.[3] State Farm and Chartier objected to the circuit court's decision to submit the issue of punitive damages to the jury. The circuit court denied all objections to the jury instructions raised by State Farm and Chartier.

At a hearing on motions after verdict on August 22, 1988, State Farm renewed its argument that the circuit court should deny insurance coverage on the theory that intent could be inferred as a matter of law. In the alternative, State Farm moved for a new trial on the issue of insurance coverage only. This motion was based upon State Farm's objection to the circuit court's instruction on the intentional-acts exclusion. In addition, State

---

[3]The grounds for State Farm's objection will be discussed below.

Farm and Chartier moved the circuit court to change the jury's answer on punitive damages. They argued that the evidence was insufficient as a matter of law to support an award of punitive damages. The circuit court denied all of the defendants' motions after verdict on September 13, 1988. Judgment was entered on September 26, 1988.

State Farm and Chartier appealed to the court of appeals. The court of appeals addressed all of the issues before this court.

The court of appeals rejected State Farm's argument that the court should infer that Chartier intended to harm Loveridge as a matter of law because his sexual contact with her violated criminal laws intended to protect minors. The court of appeals relied upon *Poston v. U.S. Fidelity & Guaranty Co.*, 107 Wis. 2d 215, 219–20, 320 N.W.2d 9 (Ct. App. 1982), in which the court of appeals held that a criminal conviction does not establish intent to injure or expectation of injury for insurance purposes if neither intent to injure nor expectation of injury is an element of the crime.

The court of appeals also held that the circuit court's instruction on the intentional-acts exclusion was erroneous but did not prejudice State Farm. The court of appeals reached this conclusion because it felt there was no evidence in the record to support the alternative instruction offered by State Farm.

The court of appeals further held that insurance coverage for sexually transmitted diseases does not violate public policy. In reaching this conclusion, the court of appeals relied upon *North Star Mutual Ins. Co. v. R.W.*, 431 N.W.2d 138 (Minn. Ct. App. 1988) (reasoning that the insurer could have specifically excluded coverage).

In addition, the court of appeals held that there was insufficient evidence to submit the issue of punitive

damages to the jury. The court of appeals reached this conclusion for two reasons. First, there was no evidence in the record that Chartier intended to inflict Loveridge with the herpes simplex virus. Second, there was no evidence in the record that Chartier knew or had reason to know that there was a strong probability he could inflict the herpes virus on Loveridge when he performed cunnilingus on her.

State Farm petitioned this court for review of the court of appeals decision, and Loveridge filed a cross-petition for review. Both petitions were granted by this court.

## INTENT TO INJURE AS A MATTER OF LAW

Loveridge seeks to recover from Chartier's homeowners insurance policy issued by State Farm. On its face, the policy's grant of coverage encompasses Chartier's transmission of the herpes simplex virus to Loveridge. The policy provides that it will pay damages for which the insured is legally liable because of bodily injury or property damage. "Bodily injury" is defined by the policy as "bodily harm, sickness or *disease,* including required care, loss of services and death resulting therefrom" (emphasis added). State Farm does not contest that the herpes virus is a disease and, therefore, is encompassed within the policy's grant of coverage.

Instead, State Farm contends that the policy excludes coverage for Loveridge's injuries under an exclusion known in the insurance industry as an intentional-acts exclusion. The intentional-acts exclusion in the policy provides that there is no coverage for "bodily injury or property damage which is expected or intended by the insured."

State Farm requests that this court infer that Chartier intended to injure Loveridge as a matter of law because Chartier's sexual contact with Loveridge, notwithstanding her consent, violated criminal laws intended to protect minors. We construe State Farm's argument as asserting error in the circuit court's failure to grant summary judgment on that basis. In many instances, summary judgment may be used to resolve issues of insurance coverage. *Raby v. Moe,* 153 Wis. 2d 101, 109, 450 N.W.2d 452 (1990). When reviewing the denial of a summary judgment motion, we apply the standards set forth in sec. 802.08, Stats., in the same manner as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

When evaluating a motion for summary judgment, the court follows a two-step process. First, the court determines if a claim for relief has been stated by examining the pleadings. Second, if a claim for relief has been stated, the court determines whether there are material issues of fact. *Id.* If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, a motion for summary judgment should be granted. Section 802.08(2), Stats.

There are no material issues of fact relevant to this issue. It is not disputed that the sexual contact between Chartier and Loveridge was consensual. Furthermore, it is not disputed that Chartier violated the criminal law by having sexual contact with Loveridge, notwithstanding her consent, because she was a minor at the time of the contact. We will review the legal issue of whether Chartier intended to injure Loveridge as a matter of law based upon these undisputed facts. We will reverse the circuit court's denial of summary judgment if it has incorrectly

decided that legal issue. *Raby,* 153 Wis. 2d at 109 (citing *Prince v. Bryant,* 87 Wis. 2d 662, 666, 275 N.W.2d 676 (1979)).

In Wisconsin, an intentional-acts exclusion precludes insurance coverage only where the insured acts intentionally and intends some harm or injury to follow from the act. *Raby,* 153 Wis. 2d at 110 (citing *Pachucki v. Republic Ins. Co.,* 89 Wis. 2d 703, 710, 278 N.W.2d 898 (1979)). An insured intends to injure or harm another if he "intend[s] the consequences of his act, or believe[s] that they are substantially certain to follow." *Pachucki,* 89 Wis. 2d at 710 (citing Restatement (Second) of Torts, sec. 8A at 15 (1965)). In other words, intent may be actual (a subjective standard) or inferred by the nature of the insured's intentional act (an objective standard). *Pachucki,* 89 Wis. 2d at 709. Therefore, an intentional-acts exclusion precludes insurance coverage where an intentional act is substantially certain to produce injury even if the insured asserts, honestly or dishonestly, that he did not intend any harm. *Raby,* 153 Wis. 2d at 113. As Professor Prosser commented:

> 'Intent, however, is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does . . .. The man who fires a bullet into a dense crowd may fervently pray that he will hit no one, but since he must believe and know that he cannot avoid doing so, he intends it. *The practical application of this principle has meant that where a reasonable man in the defendant's position would believe that a particular result was substantially certain to follow, he will be dealt with by*

*the jury, or even by the court, as though he had intended it.'*

*Raby,* 153 Wis. 2d at 111 (emphasis added) (quoting Prosser, *Law of Torts,* at 31–32 (4th ed. 1971)).

Furthermore, the exclusion precludes coverage even if the harm that occurs is different in character or magnitude from that intended by the insured. *Raby,* 153 Wis. 2d at 111 (citing *Pachucki,* 89 Wis. 2d at 714). For example, in *Pachucki,* we held that an intentional-acts exclusion precluded insurance coverage for severe eye injuries even though the insured subjectively intended only to sting the plaintiff by firing a greening pin at his body. *Pachucki,* 89 Wis. 2d at 712.

Ordinarily, the question of whether an insured intended (subjectively or objectively) harm or injury to result from an intentional act is a question of fact. *Raby,* 153 Wis. 2d at 111. However, a court may infer that an insured intended to injure or harm as a matter of law (an objective standard):

> if the degree of certainty that the conduct will cause injury is sufficiently great to justify inferring intent to injure as a matter of law.

*K.A.G. v. Stanford,* 148 Wis. 2d 158, 163, 434 N.W.2d 790 (Ct. App. 1988), *adopted N.N. v. Moraine Mutual Ins. Co.,* 153 Wis. 2d 84, 91–92, 450 N.W.2d 445 (1990). There is no bright-line rule to determine when intent to injure should be inferred as a matter of law. Rather, each set of facts:

> must be considered on a case-by-case basis; the more likely harm is to result from certain intentional con-

duct, the more likely intent to harm may be inferred as a matter of law.

*K.A.G.*, 148 Wis. 2d at 165. A court may infer intent to injure as a matter of law only in narrow circumstances. *Id.* at 163. However, an insured cannot prevent a court from inferring his intent to injure as a matter of law by merely asserting he did not intend to injure or harm. *Raby*, 153 Wis. 2d at 113.

To date, Wisconsin appellate courts have approved of inferring an insured's intent to injure as a matter of law under two circumstances.[4] In *N.N.* and *K.A.G.*, this court and the court of appeals, respectively, held that an insured's intent to injure may be inferred as a matter of law, regardless of the insured's claimed intent, when the insured's intentional act is the sexual assault or molestation of a minor of very tender years. *N.N.*, 153 Wis. 2d at 97; *K.A.G.*, 148 Wis. 2d at 165. In *Raby*, this court held that an insured's intent to injure may be inferred as a matter of law, regardless of the insured's claimed intent, when the insured's intentional act is the participation in an armed robbery. *Raby*, 153 Wis. 2d at 113. In so holding, we stated:

> We agree with the decision of the court of appeals in *K.A.G.*, and we believe that the rule set forth in that case is applicable whenever the criminal conduct of the insured is of such a dangerous character as to impose a substantial threat to the well-being and safety of innocent victims caught in the midst of that criminal conduct.

*Id.* (footnote omitted).

---

[4]By reciting these two examples, we do not hold or imply that they are the only circumstances in which intent to injure may be inferred as a matter of law.

Notwithstanding this court's holding in *Raby*, a court cannot infer intent to injure as a matter of law merely because the insured's intentional act violated the criminal law. For example, in *Poston*, 107 Wis. 2d at 219, the court of appeals held that an insured's conviction for party to the crime of conduct regardless of life did not establish that the insured intended to injure or harm as a matter of law, because intent to injure is not an element of that crime.

In *Raby*, we distinguished *Poston*. In *Poston*, the insured doused the plaintiff with gasoline that a third party, not acting in concert with the insured, set afire. The plaintiff suffered burns. *Id.* at 217. In *Raby*, the insured pled guilty to being a party to second-degree murder. The insured drove the "getaway" car in a planned armed robbery that ended in the murder of the store clerk. *Raby*, 153 Wis. 2d at 106. In the *Raby* case, we distinguished *Poston* on the grounds that:

> there was no plan or agreement between the insured and the third party to commit the crime causing injury to the plaintiff. Absent such a plan, it could not be said that the insured's intentional act of 'sloshing' gasoline on the plaintiff was, in itself, so substantially certain to result in bodily injury that an intent to injure could be inferred from the nature of the insured's intentional act as a matter of law. In the instant case, by contrast, [the insured] conspired with [others who committed the armed robbery] which resulted in the death of Steven Raby [the plaintiff's decedent] . . . .. We conclude that [the insured's] willing participation in a robbery which, by its very nature, carried a substantial risk of injury or death distinguishes this case from *Poston*.

*Id.* at 114.

171

*Raby* and *Poston* stand for the proposition that an insured's conviction of a crime gives rise to an inference that the insured intended injury as a matter of law in only two situations: (1) if intent to injure is an element of the crime, *Poston,* 107 Wis. 2d at 219, and (2) if the crime in question involves the insured's committing an intentional act that carries with it "a substantial risk of injury or death," *Raby,* 153 Wis. 2d at 114.

State Farm argues that under *N.N.* and *K.A.G.,* we should infer that Chartier intended to injure Loveridge as a matter of law because Chartier's sexual contact with Loveridge, like the sexual contact of the insureds with the plaintiffs in *N.N.* and *K.A.G.,* violated the criminal law.[5] We disagree. Neither *N.N.* nor *K.A.G.* discusses the effect of a plaintiff's consent to the insured's sexual contact with him or her. In fact, implicit in the holdings of *N.N.* and *K.A.G.* is a finding that a sexual assault upon a 9-year-old child or a 6-year-old child cannot be consensual. In contrast, in the case at bar, it is undisputed that Loveridge consented to Chartier's sexual contact with her.

State Farm cited only one case, *Linebaugh v. Berdish,* 144 Mich. App. 750, 376 N.W.2d 400 (1985) (involving intercourse and fellatio between a 21-year-old and a 14-year-old), in which a minor plaintiff consented to sexual contact with an adult and the court held that the adult intended to injure the plaintiff as a matter of

---

[5]To further support its position, State Farm cites numerous decisions from other jurisdictions holding that a court may infer an insured's intent to injure as a matter of law from the insured's sexual assault or molestation of a minor. *See, e.g., Rodriguez v. Williams,* 107 Wash. 2d 381, 729 P.2d 627 (1986); *Allstate Ins. Co. v. Kim W.,* 160 Cal. App. 3d 326, 206 Cal. Rptr. 609 (1984); *Fireman's Fund Ins. Co. v. Hill,* 314 N.W.2d 834 (Minn. 1982).

law for purposes of an intentional-acts exclusion. We decline to follow *Linebaugh* because its rationale conflicts with well-established Wisconsin law. The *Linebaugh* court reasoned that an insured's intent to injure could be inferred as a matter of law in cases of statutory rape[6] because the legislature "in making Linebaugh's alleged acts a crime certainly perceived that harm results to underaged persons engaging in sexual intercourse." *Id.,* 144 Mich. App. at 761, 376 N.W.2d at 405.

In Wisconsin, the fact that a law is intended to prevent harm is insufficient to support an inference that as a matter of law an insured intended to harm someone when the insured violated that law. In *Poston,* the court of appeals expressly rejected the position that an insured's criminal conviction for an intentional act gives rise to an inference that the insured intended to harm or injure as a matter of law. *Poston,* 107 Wis. 2d at 219–20. Significantly, the statute the insured violated in *Poston,* injury by conduct regardless of life, was obviously enacted to protect the public. However, the *Poston* court still held that intent to injure could not be inferred as a matter of law from the violation of the criminal statute. *Id.* In *Raby,* we specifically noted that the inference that the insured intended harm as a matter of law arises only when:

> the criminal conduct of the insured is of such a dangerous character as to impose a substantial threat to the well-being and safety of innocent victims caught in the midst of that criminal conduct.

*Raby,* 153 Wis. 2d at 113.

---

[6]We use the term "statutory rape" in this context to mean sexual contact that is criminal only because one party is unable to consent under the criminal law solely due to his or her age.

The facts of the case at bar do not fall within either of the situations in which Wisconsin courts will infer an insured's intent to injure as a matter of law from the insured's criminal conduct. Intent to injure is not an element of the crimes Chartier committed.[7] Furthermore, consensual sexual intercourse between an adult and a 16- or 17-year-old does not create a "substantial risk of injury or death," *Raby,* 153 Wis. 2d at 114.[8]

The reasoning supporting the dissent's conclusion that we can infer Chartier's intent to injure Loveridge as a matter of law is not persuasive. *See* dissenting op. at 197–204. As previously discussed, in order for intent to be inferred as a matter of law, the insured's conduct must be substantially certain to result in injury or death, *supra* at 168–169. Sexual contact between an adult and a 16- or 17-year-old is not substantially certain to result in the transmission of the herpes virus.

Assuming *arguendo* that pregnancy is a harm, sexual contact between an adult and a 16- or 17-year-old is not substantially certain to result in pregnancy where birth control is used. It is undisputed that birth control was used by Chartier.

Sexual contact between an adult and a 16- or 17-year-old is not substantially certain to harm the psychological and emotional well-being of the 16- or 17-year-

---

[7]See n.2 for the elements of the crimes Chartier committed by having sexual contact with Loveridge notwithstanding her consent.

[8]Contrary to the dissent's assertion, Loveridge's consent has some effect under the law: her consent makes Chartier's sexual contact with her a misdemeanor instead of a felony sexual assault.

174

old.[9] Most of the cases of sexual abuse discussed in the *Psychology Today* article cited by the dissent involved the sexual assault or molestation of children between the ages of 9 and 12. Alfie, "Shattered Innocence: Childhood Sexual Abuse Is Yielding Its Dark Secrets To the Cold Light of Research," *Psychology Today,* Feb. 1987, at 56. Moreover, the article clearly is not discussing the consequences of a 16- or 17-year-old having consensual sexual contact with an adult. For example, it refers to 2- and 3-year-old victims of molestations and quotes one expert as saying that many victims of sexual abuse initially recover and then experience psychological problems again at puberty. *Id.* The legislature recognized the difference between those under 16 and those between 16 and 18 by making sexual contact with the former a felony and sexual contact with the latter a misdemeanor. The lesser penalty for sexual contact with persons between 16 and 18 indicates that the legislature considered such contact to be less harmful than sexual contact between an adult and a person under 16 years of age.

The only remaining ground to support the dissent's position that we can infer Chartier's intent to injure Loveridge as a matter of law is the following: Sexual relations with a minor contrary to Wisconsin law is, by itself, the same as intent to harm for purposes of the instant case. *See* dissenting op. at 203. The dissent's position is directly contrary to the court of appeals' holding in *Poston* that a criminal conviction does not establish intent to injure or expectation of injury if intent to injure or expectation of injury is not an element of the crime. In *Raby,* we recognized the validity of *Poston* by

---

[9]We do not endorse or condone sexual contact between adults and minors. However, the issue in this case is insurance coverage, not the propriety of an adult and a 16- or 17-year-old engaging in consensual sexual relations.

holding that intent to injure can only be inferred as a matter of law if the intentional and criminal act in question is substantially certain to result in injury or death. *Raby,* 153 Wis. 2d at 114.

Curiously, the dissent ignores *Poston.* We cannot ignore the ramifications of the dissent's position. For example, taken to its logical conclusion, intent to injure could be inferred as a matter of law from the intentional violation of traffic laws, such as speed limits, that are enacted by the legislature and other legislative bodies to prevent injury and death. Accordingly, we reject the dissent's conclusion that the illegality of an act is sufficient to support an inference of intent to injure as a matter of law.

Moreover, State Farm's reliance on Loveridge's age is an attempt to create an exclusion for sexually transmitted diseases which is not part of State Farm's policy. At oral argument, the following exchange occurred between the court and State Farm's counsel:

> THE COURT: Are you saying that if Ms. Loveridge was not a minor, but rather was 19 or 20 at [the] time [of the sexual intercourse], there would be coverage?
> COUNSEL: That's right, because we do not have an exclusion in our policy for sexually transmitted diseases.

This court will not create an exclusion where one does not exist. *See generally infra* at 186–187. Therefore, we conclude that a court cannot infer that an adult insured intended to injure or harm a 16- or 17-year-old as a matter of law when the insured engaged in consensual sexual contact with the 16- or 17-year-old.

## INTENTIONAL-ACTS JURY INSTRUCTION AND SPECIAL VERDICT

Notwithstanding our holding that the circuit court correctly concluded it could not infer that Chartier intended to injure Loveridge as a matter of law, State Farm is not obligated to provide insurance coverage under the intentional-acts exclusion if Chartier intended to injure Loveridge as a matter of fact. The question of whether Chartier intended to injure Loveridge was submitted to the jury. The circuit court read to the jury the following instruction concerning the intentional-acts exclusion in State Farm's policy:

> Question nine in the special verdict asks whether Dale Chartier expected or intended to transmit the herpes simplex virus to the Plaintiff. For a person's conduct to be intentional, you must find that he behaved as he did for the purpose of causing harm to the other person. To find that a person acted intentionally, you must also find that he intended the consequences of his acts or believed that such consequences were substantially certain to follow from what he did.

Question 9 of the special verdict form provided in relevant part:

> Did the Defendant, Dale L. Chartier, expect or intend to transmit the herpes simplex virus to the Plaintiff, Cheryl [Loveridge] Morris?

The jury answered special verdict question 9 in the negative. State Farm argues that it was prejudiced by the jury instruction and special verdict question set forth above because they focus solely on the question of whether Chartier intended to give Loveridge the herpes simplex virus. State Farm contends that there is evi-

dence in the record from which the jury could have reasonably concluded that Chartier intended to injure Loveridge emotionally and mentally. State Farm argues that under *Pachucki,* if Chartier intended to harm Loveridge emotionally or mentally, there is no insurance coverage for the transmission of the herpes simplex virus even if Chartier did not intend to give Loveridge the herpes virus. Accordingly, State Farm reasons that it was prejudiced by the circuit court's refusal to give the following instruction, which takes into account injury or harm or injury other than the herpes virus:

Question 9 in the special verdict asks you to determine whether defendant, Dale L. Chartier, expected or intended to cause harm to plaintiff, Cheryl Loveridge Danielewski.

To answer this question, you must examine all the facts and circumstances surrounding Dale Chartier's conduct toward Cheryl Loveridge Danielewski during their contact with one another.

You may find that Dale Chartier expected or intended his conduct to cause harm to Cheryl Loveridge Danielewski, even though he did not specifically intend to cause the particular harm sustained by Cheryl Loveridge Danielewski.

If you find that Dale Chartier committed an act which was substantially certain to result in some degree of harm to Cheryl Loveridge Danielewski, then you may find that Dale Chartier expected or intended any resulting harm to Cheryl Loveridge Danielewski.

In addition, State Farm also argued that the circuit court erred by failing to include in the special verdict the following question which provided in relevant part:

When defendant, Dale Chartier, entered into a sexual relationship with plaintiff, Cheryl Loveridge

Danielewski, did he expect or intend that his conduct would cause harm to plaintiff, Cheryl Loveridge Danielewski?

■

State Farm is correct in asserting that if Chartier intended to injure Loveridge emotionally or mentally, there is no insurance coverage for the transmission of the herpes simplex virus even if Chartier did not intend to give Loveridge the herpes virus. *Pachucki,* 89 Wis. 2d at 714 (holding that an intentional-acts exclusion precludes coverage if the insured intends one harm and a harm of a different character or magnitude occurs). However, the circuit court did not err in refusing to give State Farm's requested instruction because there is no credible evidence in the record to support giving an instruction on the issue of whether Chartier intended to harm Loveridge emotionally or mentally. *Couillard v. Van Ess,* 141 Wis. 2d 459, 464, 415 N.W.2d 554 (Ct. App. 1987) (holding that a trial court errs when it gives an instruction on an issue for which there is no evidence); *State v. Turner,* 114 Wis. 2d 544, 551, 339 N.W.2d 134 (Ct. App. 1983) (holding that the appropriateness of a particular instruction turns on the facts of the case).

■

State Farm cites the following four statements made by Loveridge to support its position that there is credible evidence in the record from which the jury could have reasonably concluded that Chartier intended to harm Loveridge:[10]

---

[10]We note that State Farm's position that there is credible evidence in the record from which the jury could have reasonably concluded that Chartier intended to harm Loveridge directly contradicts State Farm's position that the issue of punitive damages should not have been submitted to the jury.

(1) That she was scared to death about having sex with Chartier;

(2) that she was scared that she might become pregnant;

(3) that she was afraid her parents would throw her out of the house if they found out she was having sex with Chartier; and

(4) that she would have been humiliated if people found out she was having sex with Chartier.

These statements regarding Loveridge's state of mind are not sufficient to raise an inference that Chartier subjectively intended to harm Loveridge. Moreover, there is no evidence in the record that Chartier subjectively intended to harm Loveridge. In fact, there is evidence to the contrary. For instance, there is evidence that the day before their first sexual intercourse, Loveridge told Chartier that she was ready to have sex with him and asked him to purchase birth control devices. Furthermore, it is undisputed that Loveridge consented to the sexual acts in question and that Chartier never used force, promises, or misrepresentations to induce Loveridge to engage in sexual contact with him.

The dissent misinterprets the record when it concludes that the record contains evidence from which the jury could conclude that Chartier intended to injure Loveridge. The record shows that Chartier wanted to have sexual intercourse with Loveridge before he knew she was a virgin. Accordingly, there is no evidence in the record that would allow a jury to reasonably conclude that Chartier wanted to have sex with Loveridge simply to deprive her of her virginity. Moreover, there is no evidence in the record that Chartier subjectively considered loss of one's virginity to be a harm, and the dissent

does not even try to argue that loss of virginity is a harm cognizable in the law under an objective standard when virginity is lost by consent. Therefore, we reject the dissent's conclusion that Chartier intended to harm Loveridge by depriving her of her virginity.[11]

We also reject the dissent's conclusion that the record contains evidence from which a jury could reasonably conclude that Chartier knew or should have known that he could infect Loveridge with herpes or lice. Dissenting op. at 204–205 n.12. There is no evidence that Chartier knew he had lice *before he engaged in sexual contact with Loveridge or that he knew prior to the sexual acts in question* that he could transmit lice to Loveridge by engaging in sexual acts with her. The record also shows that Chartier did not make the connection between cold sores and the herpes virus until *after* Loveridge had contracted herpes and that prior to his sexual contact with Loveridge, Chartier did not know that herpes could be spread from a cold sore on the mouth to the female genitals during cunnilingus. There is even evidence in the record that suggests that Chartier learned how herpes could be transferred from materials which he and Loveridge obtained after she was diagnosed as having herpes.

Moreover, even if a jury could reasonably conclude, based on the evidence in the record, that Chartier knew there was some risk of giving Loveridge the herpes virus,

---

[11]The dissent's reliance on *Hennekens v. Hoerl,* 160 Wis. 2d 144, 465 N.W.2d 812 (1991) is misplaced. Although a loss can be an injury, it is not an injury if the loss is not harmful. Furthermore, *Hennekens* did not deal with the interpretation of an intentional-acts exclusion and, therefore, is of limited relevance to the case at bar.

that is insufficient to bar insurance coverage under the intentional-acts exclusion. For the intentional-acts exclusion to bar insurance coverage, one of two situations must be present: (1) Chartier had to desire to give Loveridge the herpes virus or (2) a reasonable person in Chartier's position would have to believe that it was substantially certain (more than highly probable) that he would transmit the virus to Loveridge. *Pachucki,* 89 Wis. 2d at 709–10.

We also reject the dissent's position that the record shows that Chartier exerted psychological pressure on Loveridge. While it is true that Chartier asked Loveridge not to tell anyone about their sexual contact, Loveridge testified that it was also her desire to conceal their sexual contact. Loveridge also testified that Chartier never used any threats to induce her into having sex with him, and there is no evidence of implied threats in the record. Furthermore, while it is true that Chartier told Loveridge's mother that he thought Loveridge stole from the store till, the record shows that he raised this belief after Loveridge had contracted herpes, their sexual relationship was over, and they had become potential adversaries. Therefore, Chartier's motivation for expressing his belief, to avoid a lawsuit, is not indicative of his intent months earlier when he and Loveridge were engaging in a consensual sexual relationship. The record on this issue was aptly summarized by State Farm's counsel at the hearing on motions after verdict when he stated, while arguing against the award of punitive damages, that Chartier "[d]id not intend to do any injury or harm of any kind whatsoever" to Loveridge, and that "at all times [Chartier] had nothing but concern and in fact

love or whatever we want to call it" for Loveridge.[12]

State Farm also seems to take the position that the jury could have inferred Chartier (objectively) intended to harm Loveridge from the nature of his conduct, to wit, an adult having sexual contact with a 16- or 17-year-old.[13] By so arguing, State Farm is taking the position that Chartier's conduct was substantially certain to result in some harm to Loveridge simply because she was 16 or 17 and Chartier was an adult. We have already rejected this position by holding that consensual sexual contact between an adult and a 16- or 17-year-old does not create "a substantial risk of injury or death," *supra* at 174. Accordingly, we conclude that the circuit court correctly stated the law, as it applies in this case, in the jury instruction and special verdict.

## PUBLIC POLICY

State Farm argues that allowing insurance coverage for the negligent transmission of sexually transmitted diseases, such as the herpes simplex virus, violates the public policy of preventing the spread of sexually transmitted diseases. This is a question of law which this court decides without deference to the court of appeals or the trial court. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).

State Farm points to sec. 143.07, Stats., to support its claim that it is the policy of the state of Wisconsin to

---

[12]Moreover, at oral argument, State Farm's counsel appeared to concede that the record does not contain any evidence that Chartier intended to injure Loveridge as a matter of fact.

[13]This argument also conflicts with State Farm's position that the issue of punitive damages should not have been submitted to the jury.

prevent the spread of sexually transmitted diseases. Section 143.07 provides in relevant part:

**143.07 Sexually transmitted disease. (1)** In this section, 'sexually transmitted diseases' means syphilis, gonorrhea and other diseases the department [of health and social services] includes by rule.

**(1m)** Any person infected with a sexually transmitted disease in a communicable form *is a menace* to the public health . . ..

(Emphasis added.) The department of health and social services has defined genital herpes as a sexually transmitted disease by administrative rule. Wis. Adm. Code sec. HSS 145.12.

State Farm reasons that providing insurance coverage for the negligent transmission of the herpes simplex virus will discourage persons infected with the disease from acting responsibly because they will not be personally liable for the spread of the disease. State Farm argues that if people are able to cover the damage caused by the spread of the herpes virus with liability insurance, they will be less likely to become further educated about the disease, seek medical confirmation if they suspect they have the disease, and stop or appropriately limit their sexual behavior.

In response, Chartier and Loveridge, citing *Brown v. Maxey,* 124 Wis. 2d 426, 369 N.W.2d 677 (1985) (holding that it does not violate public policy to provide insurance coverage for punitive damages), contend that if providing insurance coverage for punitive damages does not violate public policy, providing insurance coverage for the negligent transmission of sexually transmitted diseases does not violate public policy. We agree. If the existence of insurance coverage for "wanton," "willful,"

or "reckless"[14] disregard of another's rights or interests does not promote the abdication of personal responsibility, the existence of insurance coverage for negligent transmission of the herpes simplex virus will not encourage people infected with the disease to act in an irresponsible manner.

Furthermore, the existence of insurance coverage does not necessarily promote the abdication of personal responsibility. As we commented in *Maxey,* insurance coverage does not totally alleviate the effects of damage awards. Damage awards may result in increased insurance premiums, inability to obtain insurance coverage, and injury to a defendant's reputation. Furthermore, damage awards may exceed the limit of insurance coverage. *Maxey,* 124 Wis. 2d at 447.

Moreover, this is a case of simple negligence. Taken to its logical conclusion, State Farm's position compels the conclusion that insurance coverage for damages caused by negligent operation of a motor vehicle violates public policy because the existence of insurance promotes unsafe driving.

State Farm, citing *Paape v. Northern Assurance Co.,* 142 Wis. 2d 45, 416 N.W.2d 665 (Ct. App. 1987) and sec. 143.07, Stats., contends that *Maxey* does not support Chartier and Loveridge's position because in *Maxey* the insured was not seeking coverage for an activity or event which was contrary to a policy stated by the legislature. We disagree for three reasons.

First, *Paape* did not address denial of insurance coverage on public policy grounds. Rather, the court held that it would not expand coverage beyond that required

---

[14]*Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 267, 294 N.W.2d 437 (1980).

by the terms of the policy absent a strong legislative policy. *Id.* at 51–53.

Second, the legislature's strong stance against a certain conduct or activity does not necessarily preclude insurance coverage for damages caused by that conduct or activity. For example, in *Cieslewicz v. Mutual Service Casualty Ins. Co.,* 84 Wis. 2d 91, 103–05, 267 N.W.2d 595 (1978), we held that it was not against public policy to insure against treble damages mandated by the legislature in certain dog bite cases.

Third, the existence of insurance coverage for the negligent transmission of sexually transmitted diseases will not frustrate the legislative policy behind sec. 143.07, Stats. The policy behind sec. 143.07 is to identify and treat persons infected with sexually transmitted diseases. The statute has three significant provisions to achieve its purpose. First, a diagnosis of a sexually transmitted disease must be reported to the local health officer. Section 143.07(1m). Second, an individual may be involuntarily committed for examination and treatment. Section 143.07(2). Third, a minor may be treated without parental consent. Section 143.07(1m). Insurance coverage for the negligent transmission of the herpes simplex virus will not interfere with these three provisions of the statute. Furthermore, the existence of insurance coverage may cause some individuals fearing personal financial liability for transmission of the disease to seek diagnosis and treatment.

In the final analysis, State Farm, under the guise of public policy, is asking this court to rewrite the insurance policy. As we stated in *Kremers-Urban Co. v.*

*American Employers Ins. Co.,* 119 Wis. 2d 722, 743–44, 351 N.W.2d 156 (1984):

> Although [an insurance company] in hindsight may prefer to have limited what events or occurrences trigger insurance coverage, when it has failed to do so in the insurance contract itself, this court will not rewrite the contract to create a new contract to release the insurer from a risk it could have avoided through a more foresighted drafting of the policy.

If an insurance company does not want to provide coverage for the negligent transmission of sexually transmitted diseases, it can preclude coverage by inserting a specific exclusion in the policy. *See North Star,* 431 N.W.2d at 143.[15] Therefore, we conclude that providing insurance coverage for the negligent transmission of sexually transmitted diseases does not violate public policy.[16]

## PUNITIVE DAMAGES

State Farm contends that the circuit court erred when it submitted the question of punitive damages to the jury. Whether there is sufficient evidence to submit the question of punitive damages to the jury is a question

[15]State Farm does not cite any authority holding that insurance coverage for the negligent transmission of the herpes virus, or any other sexually transmitted diseases, violates public policy.

[16]Interestingly, the dissent does not directly refute our analysis of *Maxey* or *Kremers-Urban* when it asserts, at 207, without any supporting authority, that insurance coverage is contrary to the public policy of preventing the spread of sexually transmitted diseases. Moreover, contrary to the dissent's contention at 207 that we ignored this policy, we painstakingly set forth how insurance coverage will not frustrate this policy, *supra* at 185–186, and how insurance coverage will not undermine personal responsibility, *supra* at 185.

of law which this court independently reviews. *Walter v. Cessna Aircraft Co.,* 121 Wis. 2d 221, 225-26, 358 N.W.2d 816 (Ct. App. 1984).[17]

In Wisconsin, the remedy of punitive damages is only available when the defendant acts in wanton, willful, or reckless disregard of the plaintiff's rights or interests. *Maxey,* 124 Wis. 2d at 433. Conduct that justifies punitive damages is generally of two distinct types:

> 'The first type is that in which the defendant desires to cause the harm sustained by the plaintiff, or believes that the harm is substantially certain to follow his conduct. With the second type of conduct the defendant knows, or should have reason to know, not only that his conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result but, nevertheless, he proceeds with his conduct in reckless or conscious disregard of the consequences. Neither form of conduct, therefore, involves mere inadvertence or what, in the traditional tort sense, would be called ordinary negligence.' J. Ghiardi & J. Kircher, *Punitive Damages Law and Practice,* ch. 5, sec. 5.01 at 8-9 (1984) (footnotes omitted); cited with approval in *Lundin v. Shimanski,* 124 Wis. 2d 175 n. 14, 368 N.W.2d 676 (1985).

---

[17]However, if the issue of punitive damages was properly submitted to the jury, we must affirm the jury's award of punitive damages if "there is any evidence from which the jury could have reasonably concluded that the plaintiff met his burden of proving that the defendant's conduct was 'outrageous.' " *Maxey,* 124 Wis. 2d at 433.

*Maxey,* 124 Wis. 2d at 433–34. It is the second type of conduct described by *Maxey* that this court had in mind when it stated that:

> the mere fact that the cause of action is based upon negligent conduct does not preclude a punitive damage award if the plaintiff proves the necessary aggravating circumstances beyond ordinary negligence.

*Id.* at 432. This court often uses the term "outrageous" as an abbreviation for both types of conduct which justify the imposition of punitive damages. *Id.* at 431 n.1.

The record shows that Chartier's conduct does not fall within either of the categories of conduct which justify the imposition of punitive damages in Wisconsin. In upholding the jury instruction and special verdict pertaining to the intentional-acts exclusion used by the circuit court, we held that there is no credible evidence in the record to support the conclusion that Chartier subjectively intended to injure or harm Loveridge. We also held that a reasonable person in Chartier's position would not believe that his sexual contact with Loveridge was substantially certain to result in injury or harm to Loveridge, *supra* at 183. Furthermore, the jury found that Chartier did not intend to transmit the herpes simplex virus to Loveridge. Accordingly, the record does not contain any credible evidence from which a jury, acting reasonably, could conclude that Chartier's conduct falls within the first category of conduct justifying the imposition of punitive damages.

However, our analysis cannot stop at this point because, as we noted in *Maxey,* the type of conduct that falls within an intentional-acts exclusion is not the only type of conduct that justifies the imposition of punitive damages. *Id.* at 443–44. Even if Chartier did not intend

to injure or harm Loveridge, it would have been proper to submit the question of punitive damages to the jury if there was evidence in the record from which a jury, acting reasonably, could have concluded that Chartier knew that his sexual contact with Loveridge created "a strong probability, although not a substantial certainty," *id.* at 433, that Loveridge would be injured or harmed. Such evidence falls within the second category of conduct justifying the imposition of punitive damages described in *Maxey.*

Loveridge contends that there is evidence in the record from which the jury could have reasonably concluded that Chartier's conduct falls within the second category of conduct described in *Maxey.* Specifically, Loveridge points to Chartier's statement that before his sexual contact with Loveridge, he knew that there was "a vague connection" between herpes and cold sores.

Loveridge argues that Chartier's statement that he knew there was a vague connection between herpes and cold sores makes his conduct similar to the behavior of the defendant in *Maxey.* In *Maxey,* the defendant knew of two dangerous conditions in his apartment building. First, the defendant knew of security problems in his building that were resulting in arson. Second, the defendant knew that the security problems were allowing vandals to damage the building's fire alarm system. The defendant failed to correct the problems. As a result of those conditions, a fire severely injured the plaintiff. *Id.* at 437.

While it is true that the record contains the statement quoted above, we disagree with Loveridge's conclusion that the statement constitutes evidence which justifies the submission of punitive damages to the jury. A defendant's conduct falls within the second category of

conduct described in *Maxey* only if the defendant knew or should have known that his or her conduct created an unreasonable and strong probability of harm. *Id.* at 433.

In *Maxey,* the defendant knew that the poor security was resulting in a faulty fire alarm system and arson. In contrast, in the case at bar, there was unrebutted and undisputed testimony that Chartier did not know that the herpes virus could be spread from a cold sore on the mouth to the vagina during cunnilingus.

Furthermore, there is no evidence in the record to support the conclusion that Chartier should have known that the herpes virus could be spread from a cold sore on the mouth to the vagina during cunnilingus. Chartier's statement that he knew there was a vague connection between cold sores and herpes is not, standing alone, clear and convincing[18] evidence that he should have known that herpes could be spread from a cold sore to the vagina during cunnilingus. *Cf. Cessna Aircraft,* 121 Wis. 2d at 227 n.2 (noting that "if a manufacturer studiously avoids gaining any knowledge of the defect and the specific harm it may cause, it will not have knowledge [of the high probability of harm created by its product] in the literal sense. However, it would be liable [for punitive damages] anyway" because it should have known of the danger).

There is no evidence in the record that Chartier, like the hypothetical manufacturer in *Cessna Aircraft,* avoided gaining knowledge about a danger created by his

---

[18]A plaintiff must prove the defendant's conduct was outrageous with clear and convincing evidence in order to recover punitive damages. (Clear and convincing evidence is often referred to as the middle burden of proof.) *Maxey,* 124 Wis. 2d at 433.

conduct. While Chartier's statement is some evidence that he should have known he could spread herpes from his mouth to a woman's vagina during cunnilingus, it is not sufficient to permit a reasonable jury to find by the middle burden of proof that Chartier should have known he could do so. *See generally Lievrouw v. Roth,* 157 Wis. 2d 332, 347-48, 459 N.W.2d 850 (Ct. App. 1990) (denying punitive damages where there was some evidence that the defendant was intoxicated, but it was "not sufficient to permit a reasonable jury to find by the middle burden of proof . . . that [the defendant] was alcohol-impaired at the time of the accident . . ."). Therefore, we conclude that the circuit court erred in submitting the question of punitive damages to the jury.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (concurring). I concur in the mandate. I too affirm the decision of the court of appeals.

Only intended injuries flowing from an intentional act are excluded under an intentional acts provision in a homeowners policy.[1] I do not join the majority opinion because I believe the majority opinion incorrectly states that intent to harm can be tested under either a subjective or objective standard. See majority op. at 168–169. I conclude that a subjective standard applies to intent to harm.

Prosser explains intent to harm as follows:

(1) it is a *state of mind*

---

[1] Once again we have to interpret the intentional injury exclusion in a homeowners insurance policy, a provision that has caused much litigation. *Raby v. Moe,* 153 Wis. 2d 101, 115-16, 450 N.W.2d 452 (1990) (Abrahamson, J., dissenting).

(2) about *consequences* of an act (or omission) and not about the act itself, and

(3) it extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act.[2]

Relying on the evidence, the trier of fact determines whether the actor's purpose was to bring about the consequences or whether the actor knew that the consequences were substantially certain to result from the act. The factfinder need not accept the actor's assertions about purpose or knowledge. If the factfinder concludes that a reasonable person in the actor's position would have known that the consequences in question were substantially certain, the factfinder may infer, but need not infer, from the evidence that the actor's state of mind was the same as that of a reasonable person.[3] Thus a subjective standard is applied to determine intent to harm.

When the factfinder could reach only one reasonable conclusion from undisputed facts, namely that the actor knew (or did not know) that consequences were substantially certain to result, then the circuit court determines intent to harm as a matter of law and grants a summary judgment.[4] In other cases the factfinder decides the question of intent. I believe the issue of intent to harm

---

[2]Prosser and Keeton, *Law of Torts,* sec. 8, p. 34 (5th ed. 1984). See also 1 Restatement (Second) of Torts, sec. 8A (1965).

[3]It would, however, be incorrect to instruct the jury that an actor is presumed to intend the natural and probable consequences of the actor's conduct. Prosser and Keeton, *Law of Torts,* sec. 8, p. 36 (5th ed. 1984).

[4]In *N.N. v. Moraine Mut. Ins. Co.,* 153 Wis. 2d 84, 450 N.W.2d 445 (1990), the court concluded that it could infer, as a

in this case was properly submitted to the jury for determination.

For the reasons set forth, I concur in the mandate.

STEINMETZ, J. (dissenting in part; concurring in part). I disagree with the majority's analyses and conclusions as to the issue of Chartier's intent, and therefore I dissent as to that issue. The proper holding would be to find or infer as a matter of law that Dale Chartier intended to harm Loveridge, such that the intentional act exclusion of Chartier's homeowner's insurance policy[1] effectively did not extend coverage to Chartier for his sexual acts with Cheryl Loveridge. Also, I would hold that the trial court's instruction to the jury on the intentional acts exclusion of the insurance policy was erroneous and unfairly prejudicial. As to the issue of punitive damages, I concur with the majority; Chartier and his insurance carrier are not liable for punitive damages.

Loveridge, an honor student, had just turned 16 years of age when she began working as a salesperson for a Stride Rite Shoes store in Milwaukee. The job was the first of her life. Within a few months, Stride Rite Shoes came under new ownership, and Chartier was brought in to manage the store at which Loveridge worked. Loveridge was the only employee at the store prior to the change in ownership who retained her job after Chartier became manager.

Within a few months, Chartier, then in his forties and married, began his advances toward Loveridge. He

matter of law, an intent to harm when the actor intentionally sexually assaulted a nine-year old girl.

[1] The intentional acts exclusion of Chartier's homeowner's insurance policy sets forth that liability coverage does not apply to "bodily injury . . . which is expected or intended by the insured."

194

would occasionally brush up against her body and would place his hands on her hips while passing behind her at the store counter. He told her she had nice legs. Loveridge apparently felt Chartier was someone in whom she could put her trust, because she began to tell him private matters about her family. When Loveridge's mother found out that Loveridge was discussing such matters with Chartier, she telephoned him so as to put an end to the discussions. Chartier assured Loveridge he would not cause her any problems.

Chartier continued to cultivate his relationship with Loveridge. He scheduled his and Loveridge's work hours to coincide and often came to the store to see Loveridge even though he was not scheduled to work. In hope of engaging her in sexual relations, he secretly placed a mattress, blankets and pillow in the loft above the store. One Friday night after the store had closed to the public, he turned off the store lights before Loveridge could walk out. He grabbed her hand and kissed her. At Chartier's initiative, his sexual relationship with Loveridge advanced the next morning before the store opened, when, in the loft, he performed cunnilingus on her and then proceeded to have intercourse with her. Until that Saturday morning, Loveridge had been a virgin. Chartier's sexual relationship with Loveridge continued for many months. Chartier has admitted that his sexual acts with Loveridge violated the criminal law.[2]

---

[2]Specifically, by engaging Loveridge in sexual activity, Chartier violated secs. 944.15(2) and 944.17(2) 1983-84, Stats. *See* majority op. at 163 n.2. Subsequently, the Wisconsin legislature has reaffirmed its position in favor of prohibiting sexual contact with unmarried individuals between 16 and 18 years of age. In fact, the legislature created a new chapter of the Wisconsin Criminal Code, entitled "Crimes Against Children," which went into effect in 1989. Section 948.09 1989-90 reads:

On at least one occasion of performing cunnilingus on Loveridge, Chartier had a herpes cold sore on his lip. Loveridge at some point contracted the herpes virus in her vaginal area as a result of contact from Chartier. Clusters of blisters appeared and ulcerated. The herpes, which is not curable, advanced so as to cause Loveridge "excruciating" pain and discomfort, such that she did not urinate for two days at one point. Chartier then arranged for her to see his doctor who diagnosed the herpes.

Loveridge was "devastated" by this diagnosis. Nevertheless, Chartier saw to it that his sexual relationship with Loveridge continued. In fact, that relationship did not end until sometime after her seventeenth birthday, during which interim period she remained a child under Wisconsin law. Most of the sexual acts took place at the store, including one time during business hours. A few of the acts took place at Chartier's home and elsewhere. The end of the relationship was precipitated by the discovery by Loveridge's mother of medicine for Loveridge's herpes. Loveridge, who was living at home with her parents, proceeded under pressure from her mother to tell her about Chartier's ongoing sexual relationship with her and her consequential contraction of herpes. Loveridge's mother responded by forbidding her from working at the Stride Rite store and from having any

---

**Sexual Intercourse With a Child 16 or Older.** Whoever has sexual intercourse with a child who is not the defendant's spouse and who has attained the age of 16 years is guilty of a Class A misdemeanor.

This new chapter defines "sexual intercourse" very broadly. *See* sec. 948.01(5) (1989-90). There is no question but that, committed today, Chartier's sexual acts with a child such as he committed with Loveridge in 1984 would be contrary to the criminal law.

contact with Chartier. Effectively "thrown out" of her own house by her parents after this series of events, Loveridge moved into the home of a school classmate.

I would take it as a given that no rational, mature person can reasonably believe that an individual's performance of cunnilingus and sexual intercourse on a 16-year-old girl does not involve, on the part of that individual, some expectation of or intent to cause harm to the child. Such acts against children are not simply the result of "tender mercy," *See J.C. Penney Cas. Ins. Co. v. M.K.,* 278 Cal. Rptr. 64, 68, 804 P.2d 689 (1991) or a misdirected desire for sexual gratification on the part of the perpetrator. At least most of the time, the perpetrator of such acts manifests by his conduct that he expects or intends harm to the child. Chartier himself proves the point for purposes of this case.

Chartier generally indicated to Loveridge that he wanted to have intercourse with her so that he would cause her to lose her virginity. Whether or not objectively the loss of her virginity would constitute an actual loss or harm or injury[3] to Loveridge, it is implicit that Chartier intended it as such, and no reasonable jury could conclude otherwise.[4] Because Chartier intended a harm to Loveridge and because Loveridge actually was

---

[3]For purposes of this opinion, the terms "harm," "injury," and "loss" all refer to the word "injury" contained in the intentional acts exclusion of Chartier's homeowner's insurance policy. *Cf. Hennekens v. Hoerl,* 160 Wis. 2d. 144, 465 N.W.2d 812 (1991) majority op. at 153 n.7.

[4]Contrary to the assertion by the majority at 180–181, the record does not establish when Chartier learned that Loveridge was a virgin. Nor have I argued, as the majority indicates I do, that Chartier was interested solely in causing Loveridge to lose her virginity. Having an incorrect premise, the argument of the majority contained within the paragraph at 180–181 fails.

197

harmed[5] by his acts, the intentional acts exclusion of his homeowner's policy is applicable and precludes insurance coverage.

In addition, Chartier's intent to harm Loveridge by his acts can be inferred as a matter of law. As the majority recognizes, a court may infer that an insured intended to injure or harm as a matter of law " 'if the degree of certainty that the conduct will cause injury is sufficiently great.' " Majority op. at 169. "[A]n insured cannot prevent a court from inferring his intent to injure as a matter of law by merely asserting that he did not intend to injure or harm." *Id.* at 170.

As the majority correctly points out, Wisconsin courts have appropriately approved of inferring an insured's intent to harm as a matter of law under circumstances where the insured has acted wrongfully in relation to the criminal law. *Id.* at 170–171. In particular, in *K.A.G. v. Stanford,* 148 Wis. 2d 158, 434 N.W.2d 790 (Ct. App. 1988) and *N.N. v. Moraine Mutual Ins. Co.,* 153 Wis. 2d 84, 450 N.W.2d 445 (1990), it was proper to infer as a matter of law an insured's intent to injure when the act of the insured involved the sexual assault or molestation of a child contrary to Wisconsin law. Similarly, in *Raby v. Moe,* 153 Wis. 2d 101, 113, 450 N.W.2d 452 (1990), we indicated that an insured's intent to injure may be inferred as a matter of law, regardless of the insured's claimed intent, when the "criminal conduct of the insured is of such a dangerous character as to impose a substantial threat to the well-being and safety

---

[5]It is not disputed that Chartier harmed Loveridge at least by transmitting the herpes virus to her. The fact that the particular harm resulting to the victim might not have been of the same character or magnitude as was intended by the insured is of no consequence. *Pachucki v. Republic Insurance Co.,* 89 Wis. 2d 703, 714, 278 N.W.2d 898 (1979).

of innocent victims caught in the midst of that criminal conduct."[6]

Clearly, Chartier's criminal conduct imposed such a "substantial threat" to Loveridge as a child in the eyes of the law. The degree of certainty that the conduct would cause injury was sufficiently great. In fact, in at least some ways, the threat and actual harm faced by Loveridge was greater than that faced by the children in *K.A.G.* and *N.N.*.

Perhaps most obviously, Loveridge faced a substantial threat and incurred an actual injury in terms of the herpes Chartier transmitted to her by his criminal conduct. The fact that Chartier's criminal conduct seriously harmed her well-being is evident from the "excruciating" pain the herpes caused her and will continue to cause her whenever its symptoms recur. Indeed, her overall well-being has been affected so adversely that she has deemed it worth her time and trouble to base this lawsuit on that very injury.[7]

Moreover, as a direct result of Chartier's criminal conduct, Loveridge faced the substantial possibility of being impregnated by Chartier.[8] Loveridge herself recog-

---

[6]Contrary to the assertion by the majority at 176, I do not "ignore" any effect of *Poston v. U.S. Fidelity & Guaranty Co.,* 107 Wis. 2d 215, 320 N.W.2d 9 (Ct. App. 1982). As the majority indicates, this court "recognized the validity" of *Poston* in *Raby.* Majority op. at 175. By relying as I do on *Raby* and employing at various points throughout this dissent its operative language of "substantial certainty" concerning the possibility of harm to the victim, which language *Raby* took from *Poston* and *Pachucki,* I have effectively dealt with *Poston. See* my concurring opinion in *Raby,* 153 Wis. 2d at 115.

[7]Judging from the size of the damage award made by the jury, it is clear that the jury also considered the injury to affect her well-being substantially.

[8]The majority says that because "birth control" was used by

nized the substantial risk that Chartier might impregnate her. At one point, she told Chartier that she considered the particular form of birth control that he was using to be unsafe insofar as it might not prevent a pregnancy; she said she wanted him to use some safer method. Under the circumstances of this case, a pregnancy clearly would have constituted a harm to Loveridge's physical and material well-being. The requirement that there be some "substantial certainty" of harm developing in order to infer intent to harm does not mean, as the majority in effect argues, that there must be mathematical certainty of harm. In this case, there was, as a matter of law, a substantial certainty that pregnancy could have resulted. The substantial certainty of this

---

Chartier, it simply cannot be substantially certain that a pregnancy might nevertheless have resulted. Majority op. at 174. The majority ignores certain realities of birth control.

As a prominent federal court has noted: "The frequency of contraceptive failure is unexpectedly high." *McRae v. Califano,* 491 F. Supp. 630, 672 n.37 (E.D.N.Y. 1980). Failure rates in the first year of exposure to the risk of pregnancy have been authoritatively calculated for certain artificial birth control methods as follows:

| Method | Percent Failing |
|---|---|
| Pill | 6 |
| IUD | 12 |
| Condom | 18 |
| Diaphragm | 23 |
| Foam | 31 |
| Douche | 39 |

Moreover, as the federal court noted, the pill and IUD "are thought to create serious medical risks." *Id.*

200

particular harm was sufficiently great so as to warrant an inference of intent to harm on the part of Chartier.

In addition to facing these injuries, Loveridge faced substantial threats in terms of her psychological and emotional well-being, to which threats she was particularly vulnerable in light of her young age and lack of prior sexual experience.[9] At 16 years of age, Loveridge simply was unprepared to handle the situation presented

---

[9]As Loveridge stated, she was experiencing a certain psychological or emotional "confusion" resulting from Chartier's advances on her. In this regard, it is becoming well documented that a high proportion of children who are sexually mistreated by adults develop psychological problems later in life such as borderline personality disorders and post-traumatic stress disorders. *See generally,* Alfie, *Shattered Innocence: Childhood Sexual Abuse Is Yielding Its Dark Secrets to the Cold Light of Research,* Psychology Today, Feb. 1987, at 54.

The majority would apparently suggest that the article I cite immediately above is written only in regard to "2- and 3-year old victims" of sexual molestation and abuse perpetrated by adults. *See* majority op. at 175. Such a suggestion is in fact erroneous. The study discussed in the article involved research into adult sexual molestation and abuse against children of all ages up to "the age of 18." Alfie at 54.

The article proceeds to indicate that certain research shows that child "victims are most traumatized if their abuser was between the ages of 26 and 50." *Id.* As I indicated *supra,* that is exactly the age group of which Chartier was a member when he committed his crimes against Loveridge.

Clearly, the Psychology Today article offers strong scientific evidence to show that there was a "substantial certainty," *see* majority op. at 168 that a child such as Loveridge would suffer "psychological and emotional harm," the likes of which the majority says is sufficient to infer intent to harm. For its part, the majority does not offer any evidence to counter the thrust of the Psychology Today article.

her by Chartier. Looking back years later, she said of Chartier's advances and sexual relations with her:

> The whole thing was a big scam. He manipulated me right from the start. He was an excellent salesman and he used his skills on me. He got my trust. He won me over and then it was just—it was just so gradual, I didn't even realize that it was happening until it was too late.

She also testified that:

> I knew it was wrong but I didn't know what to do. I was confused. I trusted him. I didn't think he would hurt me. I really didn't think he would hurt me.

Her words imply that Chartier in fact did hurt her in more than a physical way. Indeed, one of the injuries she suffered was that of unmitigated fear as to the possible consequences of Chartier's actions. In this regard, she said:

> I was scared to death . . . I was afraid I might have gotten pregnant, you know. I was scared my parents would find out. They had always told me that if anything like that ever happened before I was married, they would throw me out of the house . . . And I didn't know what to do.

Another fear that Loveridge testified to having was that of others, in addition to her parents, finding out about Chartier's relationship with her. She stated that she would "be humiliated" if anybody learned of the sexual encounters.

Following from Loveridge's own testimony, she must have been humiliated indeed upon being pressured by her mother to tell her of Chartier's acts toward her. Furthermore, she was harmed by being effectively "thrown out" of her own house by her parents. She was

also humiliated when others discovered the fact of the sexual encounters.

These actual and potential injuries, and Loveridge's corresponding fears that harm would result to her, all constituted substantial threats to her well-being resulting from Chartier's criminal conduct. I submit that these many and various harms and threats thereof were inherent in the acts committed by Chartier against Loveridge in violation of the criminal law such that in committing the acts Chartier intended the harms. As the majority acknowledges at 179, even if Chartier intended only to injure Loveridge emotionally and mentally, his insurance policy precludes coverage for the transmission of the herpes virus.

My position is consistent with the policies and goals of the people of Wisconsin as stated by the state legislature. Implicit in the legislature's determination that children must be protected from acts such as those committed by Chartier against Loveridge is a determination that at least some harm is inherent in and inevitably results from those acts.[10] Sexual relations with a child contrary to Wisconsin law is thus, by itself, the same as intent to harm the child for purposes of the instant case. The act is the harm and the intent to harm. See *M.K.*, 278 Cal Rptr. at 73. The fact that Chartier professes not to have, strictly speaking, intended some harm or loss to Loveridge is completely irrelevant. One who violates the statutes of this state prohibiting the sexual abuse of children should not be able to disclaim an intent to harm his victim.

In attempting to distinguish *N.N.* and *K.A.G.,* the majority says that:

---

[10]If this case is any example, that determination is a particularly realistic one.

> [I]mplicit in the holdings of *N.N.* and *K.A.G.* is a finding that a sexual assault upon a 9-year-old child or a 6-year-old child cannot be consensual. In contrast, in the case at bar, it is undisputed that Loveridge consented to Chartier's sexual contact with her.

Majority op. at 172. The majority never explains the relevance of Loveridge's "consent" to Chartier's violation of the criminal law.[11] In fact, there is no practical distinction to be made: under secs. 944.15(2) and 944.17(2), Stats. 1983–84, a child victim is unable to "consent" to another's violation of the statutes such that the violation is in any way nulled and voided. The statutes indicate that no such "consent" can effectively be made.

As a practical matter, even if the question of Loveridge's "consent" is relevant, it is so in a way that undercuts the majority opinion. In the majority's own words, Loveridge's "consent" pertained only to the "sexual contact" that Chartier had with Loveridge. That is, Loveridge only consented to the contact; she never consented to having the herpes virus transmitted to her by that contact or to being harmed in other ways by that contact. She did not and could not consent to having the virus transmitted to her because she never even knew Chartier had the virus. She never knew because Chartier failed to so inform her.[12] Nor did she or could she con-

---

[11]The fact that Loveridge's "consent" resulted in Chartier committing "only" a misdemeanor crime instead of a felony crime does not, as the majority suggests (majority op. at 174 n.8) make the "consent" relevant for purposes of the case at bar. Chartier still violated the criminal law, whether or not Loveridge "consented."

[12]Clearly, Chartier knew or should have known that he could infect Loveridge with the virus. He knew that the herpes that caused him to have cold sores and genital herpes are related;

sent to the emotional and mental harms that resulted to her from Chartier's actions, because, as a child, she had no meaningful appreciation for the possibility and reality of those harms. Thus, even her "consent" to sexual contact was no consent at all for purposes of this case. There being no consent, the majority cannot distinguish *N.N.* and *K.A.G.* as it desires.

The majority treats sexual acts criminally perpetrated against children as though they amounted to the moral and practical equivalent of deciding what clothes to wear. Insofar as human actions and the statutes of this state have meaning, the majority errs. Wisconsin courts should infer an insured's intent to injure as a matter of law where the insured violates the law pertaining to sexual acts committed against children.

I also submit that this court should hold that the trial court's instruction to the jury on the intentional acts exclusion of the insurance policy was erroneous and unfairly prejudicial.[13] There is abundant credible evidence in the record from which the jury could have rea-

moreover, he knew that diseases of that nature can be sexually transmitted from one person to another.

For example, when Loveridge first described to Chartier the problem she was suffering in her pubic area, Chartier indicated to her that she might have contracted lice. He indicated that he had just been treated for lice in his pubic area and implied that he had infected her with the "lice" through their sexual relations.

Further evidence of Chartier's prior knowledge of the possibility that his herpes could be transmitted to Loveridge lies in the fact he pointed to a cold sore on his lip when Loveridge questioned him about the problem she was experiencing. As he pointed, he said to her, "This is herpes. This is." He then indicated to her that herpes is probably what she had.

[13]The instructions read by the trial court to the jury, as well as special verdict question 9, are set forth in the majority opinion at 177–178.

sonably concluded that Chartier intended to injure Loveridge in ways other than simply the transmission of the herpes virus to her, and the defendant insurance company was prejudiced by the circuit court's refusal to give its proposed instructions and special verdict questions which took into account those other ways that injury or loss or harm were "intended" to result to Loveridge.[14]

In the first place, consistent with my discussion of the first issue, Chartier's very violation of the criminal law in his sexual relations with Loveridge raises an inference that he intended to harm her beyond simply giving her the herpes virus. In addition, there is abundant evidence, referred to above, indicating that he subjectively intended to cause an injury or loss to her by having her lose her virginity. Moreover, after their first sexual encounters, Chartier demanded of Loveridge that she not disclose their sexual relationship. Under the circumstances, this constitutes evidence of an intent on his part to exert psychological pressure on her. Although he never explicitly threatened to fire her from her sales job if she disclosed the fact of the encounters, there is clearly evidence by which a jury could conclude that an unspoken threat of that nature was implicit in his demands. In and of itself, such a threat amounts to an intent to harm. Also, at trial, Chartier testified to believing that Loveridge was stealing from the store till. According to his testimony, he did not raise the fact of this belief to anyone until it became clear to him that Loveridge, after her mother discovered the relationship, might bring suit against him. As he explained, he raised the subject of his belief of her stealing so as to discourage any lawsuit against him by Loveridge. In effect, his actions were strong evidence of an intent to blackmail Loveridge, to

[14]The defendant's proposed jury instructions and special verdict question are set forth in the majority opinion at 178–179.

206

take unfair advantage of a situation unfavorable to her which he had allowed to develop and then encouraged. This amounts to strong evidence of an intent to harm Loveridge.

The circuit court thus erred in giving the instructions and special verdict questions it gave on the intentional acts exclusion of the insurance policy and in not including the instructions and special verdict questions offered by the defendant. Because there is more than a reasonable possibility that the circuit court's error was unfairly prejudicial to the defendant, I would reverse and remand on this issue insofar as the court has not found or inferred intent to harm on the part of Chartier which finding or inference would render this issue irrelevant.

I also believe that the majority's decision is contrary to the public policy of preventing the spread of sexually transmitted diseases such as herpes. The majority never expressly acknowledges there is such a policy; however, given sec. 143.07, Stats.,[15] and the fact that under Wisconsin law the negligent transmission of sexually transmitted diseases is actionable, it is clear that such a policy exists.

The majority ignores this policy. It effectively encourages individuals such as Chartier to develop a care-free approach to sexual relations that will result in a greater propensity for diseases such as the herpes virus to be spread among society, contrary to state policy.[16]

---

[15]The majority opinion at 183–184, sets forth parts of sec. 143.07, Stats. The statute prescribes, *inter alia*, that any court of record may commit a person infected with a sexually transmitted disease to an institution for treatment until the disease is no longer communicable.

[16]The majority must concede that, at least at the margin, the conduct of society generally speaking is based upon a series of conscious choices made by rational individuals who are generally

That is, because of the majority opinion, an individual such as Chartier will not be encouraged to stop the spread of such diseases to others because as a practical matter he stands little or nothing to lose by not conforming his conduct to the policies of the state.

The majority's assertion that, "[t]aken to its logical conclusion," the argument of the defendant insurance company must be that motor vehicle insurance "promotes unsafe driving," majority op. at 185, is simply without merit. Anybody driving an automobile is himself at risk of injury, and so has concern for his own well-being in operating his vehicle. Accordingly, he has a self-interest in safe driving and, thus, he tends to drive safely. In contrast, Chartier was risking no particular harm to his physical well-being when he sexually engaged Loveridge on the mattress in the loft of the Stride Rite store. Personally, he was risking nothing, and so he was not encouraged to act thoughtfully and carefully. Because she was a virgin, even the risk of her transmitting a venereal disease to him was nonexistent, and he must have known so.[17]

Thus, the majority errs in this regard also. This court should favor the public policy of preventing the spread of sexually transmitted diseases.

I agree with the majority that, on the merits, punitive damages should not be awarded in this case.[18] This

informed as to the policies of the state and whether or not as a practical matter those policies are enforced by state officials.

[17]In any case, there clearly was no risk that she could harm him by giving him the herpes virus insofar as he was already so infected.

[18]It continues to be my fundamental position that public policy requires that punitive damages not be covered by insurance. *See* my dissent in *Brown v. Maxey,* 124 Wis. 2d 426, 451-52, 369 N.W.2d 677 (1985).

conclusion is consistent with my position that this court should find or infer that Chartier intended harm to Loveridge.

The main distinction to be drawn here has its basis in the different burdens of proof involved. In order for the intentional acts exclusion of an insurance policy to be held to apply in a given case, it must be shown by only a preponderance of the evidence that harm was intended. In contrast, for punitive damages to be awarded, the plaintiff must prove by clear and convincing evidence that the defendant's conduct was reckless, willful or wanton. *Brown v. Maxey,* 124 Wis. 2d 426, 433, 369 N.W.2d 677 (1985). While as a matter of law Chartier intended harm to Loveridge, there is insufficient evidence according to which a jury might reasonably find that Chartier, clearly and convincingly, acted recklessly, willfully, or wantonly.

In summation, I would hold that Wisconsin courts should infer that one intends harm to his victim as a matter of law when he violates state law against sexual intercourse with a child, regardless of the child's age. I would also hold that the circuit court's instruction to the jury on the intentional acts exclusion of the insurance policy was erroneous and prejudicial. I would also hold that public policy prevents insurance coverage for negligent transmission of sexually transmitted diseases.

I would thus reverse the circuit court as a matter of law. At the very least, the case should be remanded for a new trial incorporating proper jury instructions and special verdict questions. As to the issue of punitive damages, I agree with the majority that Loveridge is not entitled to collect punitive damages that would be paid by Chartier's insurance company.